

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-2-1998

# United States v. Nolan-Cooper

Precedential or Non-Precedential:

Docket 97-1171,97-1298

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

## Recommended Citation

"United States v. Nolan-Cooper" (1998). *1998 Decisions.* Paper 211.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/211

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 2, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 97-1171 and 97-1298

UNITED STATES OF AMERICA

v.

ANGELA NOLAN-COOPER
Appellant

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Crim. No. 95-cr-00435)

Argued: March 19, 1998

Before: BECKER, Chief Judge, RENDELL and
HEANEY,* Circuit Judges.

(Filed September 2, 1998)

      DAVID M. HOWARD, ESQUIRE
       (ARGUED)
      JEFFREY S. EDWARDS, ESQUIRE
      Dechert, Price & Rhoads
      1717 Arch Street
      4000 Bell Atlantic Tower
      Philadelphia, PA 19103

Attorneys for Appellant

_____

*Gerald W. Heaney, United States Circuit Judge for the Eighth Circuit,
sitting by designation.

          MICHAEL R. STILES, ESQUIRE
          United States Attorney
          WALTER S. BATTY, JR.
          Assistant United States Attorney
          Chief of Appeals
          TERRI A. MARINARI, ESQUIRE
            (ARGUED)
          Assistant United States Attorney
          Office of the United States Attorney
          One Independence Hall
          615 Chestnut Street
          Philadelphia, PA 19106-4476

          Attorneys for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

In United States v. Twigg, 588 F.2d 373 (3d Cir. 1978), we sustained a defendant's claim that the government's investigatory misconduct was so egregious that the due process clause demanded dismissal of the indictment against him. This holding was predicated on a pair of Supreme Court cases that appeared to recognize such a defense, United States v. Russell, 411 U.S. 423 (1973), and Hampton v. United States, 425 U.S. 484 (1976). In contrast to some other circuits which have never recognized the defense or no longer do so, see United States v. Tucker, 28 F.3d 1420, 1426-27 (6th Cir. 1994); United States v. Boyd, 55 F.3d 239, 241 (7th Cir. 1995), it has remained viable in this circuit, though in the twenty years since Twigg we have not found another set of facts that satisfy its rigorous requirements. See United States v. Voigt, 89 F.3d 1050 (3d Cir.), cert. denied 117 S. Ct. 623 (1996). In the present appeal, defendant Angela Nolan-Cooper contends that the government's misconduct in its investigation of her was sufficiently egregious enough to warrant this extraordinary relief.

Ms. Nolan-Cooper, a Philadelphia lawyer, became the target of an Internal Revenue Service ("IRS") investigation

2

when the government received information that she was involved in the laundering of illicit drug proceeds. The IRS set up a sting operation as part of its investigation, and Nolan-Cooper readily accepted the opportunity to launder funds for an undercover government agent who was posing as a wealthy drug dealer from Louisiana. During the course of the thirteen-month investigation, however, the government agent insinuated himself into a close social relationship with Nolan-Cooper, which culminated, on one occasion, in sexual intercourse. It is this relationship which Nolan-Cooper argues crossed the bounds of permissible investigatory activity.

Nolan-Cooper moved to dismiss the indictment. The district court disagreed with her characterization of the government's conduct as "outrageous," and denied the motion. Had the sexual misconduct been present throughout the investigation (with the actual or constructive knowledge of supervisory personnel), a different situation would be presented. However, it did not occur until the investigation was nearing its close. Moreover, after an extensive evidentiary hearing, the district court found that the agent's sexual exploits served no investigatory purpose, and that there was no evidence of discussions among the investigating agents and their superiors concerning the use of sex to induce Nolan-Cooper's continued participation in the illicit scheme. In light of these non-clearly erroneous findings, and despite the fact that some criminal activity took place after the sexual misconduct, we cannot agree that the government's conduct here offends due process. We will therefore affirm the district court's denial of Nolan-Cooper's motion to dismiss.

Nolan-Cooper preserved for appeal the district court's ruling on her motion by a conditional guilty plea to thirteen counts of conspiracy and money laundering, for which she was sentenced to seventy-two (72) months in prison plus a fine and forfeiture of certain assets. In return for her plea, the government agreed that it would recommend a term of incarceration within the stipulated range of 41 to 51 months. The government also agreed that it would not oppose Nolan-Cooper's position on the applicability of

3

certain Sentencing Guideline provisions to her guideline range calculation. Nolan–Cooper contends that the government breached the plea agreement by failing to follow through on these promises. We agree. Because our jurisprudence establishes that when a plea bargain is breached, resentencing must be before a different district judge, our mandate will require that the case be re-assigned to another judge of the district court for resentencing.

Nolan–Cooper also argued at sentencing that the government's misconduct during the undercover investigation, even if it did not rise to the level of a due process violation, warranted a downward departure from the applicable sentencing range. The court rejected her contention and declined to grant the departure, apparently because the court believed that it was precluded from departing because the government's misconduct was neither related to Nolan–Cooper's guilt nor rose to the level of a due process violation. Since we must remand for resentencing because of the breached plea agreement, we need not rule on Nolan–Cooper's claim that the court was not so precluded. However, since we presume that Nolan–Cooper will move for a departure on the same grounds at her resentencing, for the guidance of the district court we will discuss the merits of her claim. Under the approach set forth by the Supreme Court in Koon v. United States, 518 U.S. 81 (1996), we believe that the district court is not categorically precluded from departing based upon government investigatory misconduct, and therefore the court may consider on remand whether the facts presented here take this case outside of the Guidelines' "heartland" and thereby warrant a downward departure.

I. Facts and Procedural History

The district court held an evidentiary hearing and made extensive findings of fact. Neither party has challenged these findings and we therefore accept the facts as the district court has found them.

A. The Money Laundering Scheme

This case arises out of an IRS investigation into the money laundering activity of Nolan–Cooper, who became a

target when that agency received information from confidential informants that she was assisting others to launder funds derived from illegal activities, including the sale of drugs. At some point, the IRS apparently determined that it would attempt to inculpate Nolan-Cooper by setting up a sting operation. In order to effectuate the sting, the IRS arranged to have Special Agent Louis Oubre pose undercover as "Louis Richard," a wealthy drug dealer from New Orleans. On February 7, 1994, a meeting between Nolan-Cooper and Oubre at a hotel near the Philadelphia International Airport was arranged by one Oswald McBride, an acquaintance of Nolan-Cooper's who had, unbeknownst to her, become a confidential government informant. Nolan-Cooper attended the meeting on the understanding that "Mr. Richard" had some business to discuss with her. During the meeting, Oubre informed Nolan-Cooper that he was a drug dealer and that he had significant drug proceeds that he wanted to make look legitimate.

At this meeting, Nolan-Cooper told Oubre that she could assist him in a number of ways. Specifically, she informed him that she could accomplish his goals by (1) setting up a sham business; and (2) hiding his money in Bahamian bank accounts. She further assured Oubre that she was experienced in the art of laundering money, asserting that "the way I do it, I'm . . . not gonna make any mistakes," and claiming that she had had "plenty of clients" who were in similar situations. When the agent asked her, "how soon . . . can we start," Nolan-Cooper replied, "right away."

Indeed, Nolan-Cooper began assisting Oubre right away. Two days after the initial meeting, on February 9, Nolan-Cooper and Oubre met again, at which time they discussed a plan to set up a sham corporation.[1] On March 11, 1994, Oubre met Nolan-Cooper for a third time, and gave her $12,000 to open a sham corporate bank account. At this meeting Nolan-Cooper explained to Oubre how the sham corporation would work, so as to avoid detection by the government. Additional details of the money laundering

_____

1. The details of the sham corporation are not relevant to the present appeal. In brief, Oubre and Nolan-Cooper set up "LAR Productions, Inc.," a purported music production, promotion, and recording company.

5

scheme were arranged in meetings in May through December 1994. Importantly, on May 10, Oubre gave Nolan-Cooper $42,000 in cash to launder through the sham corporation. She informed Oubre at that time that she could not launder the entire amount all at once, and that she would need to do it gradually, in smaller increments.

Nolan-Cooper continued to launder funds for Oubre through March of 1995. On December 19, 1994, for example, Oubre gave Nolan-Cooper $85,000 to transfer into a Cayman Islands bank account, explaining that he needed the money deposited there in order to consummate a drug transaction. Oubre paid Nolan-Cooper $8,490 to perform this transfer. All told, the total amount of laundered funds involved in the scheme to which Nolan-Cooper has pled guilty was $192,772. The district court concluded that:

> The evidence is overwhelming that Ms. Nolan-Cooper's criminal conduct in this case was pervasive and entirely voluntary. From the first meeting with Agent Oubre, Ms. Nolan-Cooper planned the scheme to launder the proceeds of drug activities, recruited coconspirators, counseled Agent Oubre as to how to execute the scheme, and then personally undertook to effectuate the objectives of the conspiracy.

Attachment to Appellant's Brief ("Att.") at 46 (Memorandum dated Mar. 11, 1997, on Defendant's Motions for Downward Departure and Other Sentencing Issues, at 11).

B. Agent Oubre's Romantic Overtures

During the approximately thirteen-month undercover investigation, Agent Oubre made several trips to the Philadelphia area to meet with Nolan-Cooper. In order to maintain his cover as a wealthy drug dealer, Oubre stayed in expensive rooms at the city's best hotels, rented fancy cars, ate expensive dinners, and consumed a considerable amount of alcohol. Moreover, during these visits Oubre initiated many social get-togethers with Nolan-Cooper, typically involving dinner at pricey restaurants, drinks, and partying late into the evening at area nightclubs. They were paid for by Oubre (with funds supplied by the government) and often cost upwards of several hundred dollars per

night. These social events sometimes included other individuals (some of whom were suspected co-conspirators), and sometimes involved only Oubre and Nolan-Cooper, who apparently accepted Oubre's invitations without much resistance.

Although not involving formal business discussions, Oubre used these social meetings to develop and cement a relationship with Nolan-Cooper. There is also testimony in the record (though the district court did not make reference to these facts in its opinion) that Oubre often bought Nolan-Cooper small gifts, that he addressed her with affectionate pet names, and that, on two occasions, he was seen being physically affectionate with her. In addition, Oubre was also introduced to other targets of the investigation and other suspected co-conspirators as a result of these efforts.

The present appeal revolves primarily around the events of February 17, 1995. On that day, Oubre had arranged one of the social occasions just described. An evening of dinner and nightclubbing was planned, with the scheduled attendees to include Oubre, Nolan-Cooper, Special Agent Henry Jolly (posing as Oubre's bodyguard, "Tony Jones"), and Donita Nero, a friend of Nolan-Cooper's. Oubre had also invited Michael Taylor, another target of the investigation. When Taylor subsequently declined to attend, Daniel Rose, the group manager of the IRS investigation, decided that the evening's events should be canceled entirely. Oubre, however, suggested to Rose that such a sudden cancellation might anger Nolan-Cooper. Rose eventually decided that the agents would be allowed to attend the scheduled dinner, but instructed them to return to their hotel for debriefing immediately thereafter. Oubre then called Nolan-Cooper and informed her that he and Agent Jolly had "business" later that evening, and that they consequently would have to excuse themselves after dinner.

Nolan-Cooper and Nero arrived at the hotel suite shared by agents Oubre and Jolly at approximately 8:30 p.m. After drinks from the suite's mini-bar, the foursome left for dinner at an expensive Philadelphia area restaurant. They returned to the suite at 11:30 p.m., at which point Nolan-Cooper and Nero retrieved their car and departed. According to Nolan-Cooper and Nero, Oubre and Jolly had

made plans to reunite with them at Quincy's, a Philadelphia nightclub, following completion of their "business." Oubre denied this. He testified that the two women had informed him where they were going to be later in the evening, and that he replied that he might try to call them if he and Agent Jolly finished their "business" early enough.

IRS agents debriefed Oubre and Jolly until about 1:00 a.m. According to Oubre, he and Jolly wanted to "unwind" after the debriefing, and so they proceeded to a nightclub known as Club Illusions to do so. Oubre further testified that he did not like the crowd there that night, and so he and Jolly decided to move to Quincy's instead. Whether the meeting was planned or by chance, Oubre and Jolly happened upon Nolan-Cooper and Nero at Quincy's just as it was about to close for the evening. Shortly thereafter, all four proceeded back to the agents' hotel suite -- at, according to Nolan-Cooper, the agents' request.

What occurred once they arrived at the suite is disputed. According to Nolan-Cooper (whose account of the facts the district court essentially accepted), she, Nero and the agents initially sat in the living room of the suite, which was adjacent to the two separate bedrooms. Bottles of wine were ordered to be brought up to the suite. At some point thereafter, Oubre and Nolan-Cooper excused themselves from Jolly and Nero and went into one of the bedrooms, where they stayed for some period of time (between forty-five minutes and two hours, according to the testimony). During that time Oubre and Nolan-Cooper engaged in sexual intercourse.

Nero testified that while Oubre and Nolan-Cooper were in the bedroom, she and Agent Jolly talked and kissed. Sometime between 5:00 a.m. and 6:00 a.m., after Oubre and Nolan-Cooper emerged from the bedroom, the agents drove her and Ms. Nero back to Quincy's, where their car was still parked, and they departed. Nero testified that her phone was ringing when she eventually arrived at her home, and that the caller was Jolly, entreating her to return to the hotel suite. Nero responded by inviting Jolly to her home instead.

8

Jolly arrived at Nero's home later that morning, and they proceeded to engage in sexual intercourse. According to Nero, she drove Jolly back to the hotel suite at approximately 12:30 p.m. During this ride, Jolly was paged by Oubre, and cellular phone records indicate that Jolly returned that page by calling the hotel shortly thereafter. The district court found that this series of calls suggests that the agents attempted to develop a "cover story" which they would use to explain to their superiors their conduct from the night before. The court reached this conclusion partly in light of the fact that the agents failed to contact their supervisors at any time during the period of the evening that they spent with Nolan-Cooper and Nero.

The district court found that the sexual activity between Oubre and Nolan-Cooper was not "part and parcel of a government scheme to use sex as a tool in the investigation." To the contrary, the court determined that the conduct of Agents Oubre and Jolly on the night in question appeared to be directed at "shaking loose" from the oversight of their supervisors, who apparently would have disapproved of their plans. The court found no evidence, at any stage of the investigation, of discussions concerning the use of sex as an inducement, reward or lure to obtain Nolan-Cooper's cooperation in the illegal activity. Indeed, the court found no evidence whatsoever that there was "any nexus or connection between the alleged sex and the investigation."[2]

C. Procedural History

The IRS investigation of Nolan-Cooper ended with her arrest on March 24, 1995, and her subsequent indictment. She moved to dismiss the indictment based on the alleged sexual misconduct by the undercover agents assigned to her case. After a six-day evidentiary hearing, the district court denied the motion. Att. at 3. Although the district court found that Oubre had engaged in sexual intercourse

_____

2. Nolan-Cooper also claimed that she and Agent Oubre engaged in sexual intercourse on two other occasions -- August 12-13, 1994, and December 16-17, 1994. The court did not find these allegations to be supported by the facts, and Nolan-Cooper has not challenged the findings as clearly erroneous.

9

with Nolan-Cooper, and had attempted to cover-up the events of the night in question, it rejected the claim that Oubre's conduct was sufficiently outrageous to violate Nolan-Cooper's due process rights and warrant a dismissal. Att. at 27-28.

Following the district court's rejection of her motion to dismiss, Nolan-Cooper entered a guilty plea to thirteen counts of the superseding indictment, including conspiracy and substantive money laundering charges.3  After a hearing, the district court imposed a sentence of 72 months incarceration, plus a fine of $10,000 and forfeiture of $41,955.38. Alleging that the government had breached the plea agreement at the sentencing hearing, Nolan-Cooper filed a motion for resentencing, which was denied. See United States v. Nolan-Cooper, 957 F. Supp. 647 (E.D. Pa. 1997). This appeal, of both the sentence and the order denying the motion to dismiss, followed. We have appellate jurisdiction pursuant to 28 U.S.C. S 1291.

II. The Motion to Dismiss for Outrageous Government Conduct

Nolan-Cooper's first contention on appeal is that the district court erred in rejecting her motion to dismiss the indictment. That motion was premised on the claim that the government's conduct in investigating this matter was outrageous and constituted a violation of her due process rights. According to Nolan-Cooper, Agent Oubre's cultivation of a romantic and ultimately sexual relationship

_____

3. Nolan-Cooper pled guilty to:

> 1) One count of conspiracy to commit money laundering, in
> violation of 18 U.S.C. S 1956(h) and 18 U.S.C. S 1956(a)(3)(B);

> 2) Ten counts of money laundering and aiding and abetting, in
> violation of 18 U.S.C. S 1956(a)(3)(B) and 18 U.S.C. S 2;

> 3) One count of conspiracy to structure or assist in structuring
any
> transaction with one or more domestic financial institutions, in
> violation of 18 U.S.C. S 371 and 31 U.S.C.S 5324(a)(3); and

> 4) One count of criminal forfeiture pursuant to 18 U.S.C.
> S 982(a)(1).

with her was part of his investigative strategy and, as such, was an unjustifiable intrusion into the most personal aspects of her life in violation of her fundamental (due process and privacy) rights. The district court saw it differently. While the court found that Agent Oubre's conduct was "reprehensible," see Nolan-Cooper, 957 F. Supp. at 664 n.30, it concluded that:

> The court does not find that in the totality of the circumstances a single incident by the undercover agent which was not approved or planned by the Government agents in charge of the investigation who had exercised due diligence and control over the activities of the undercover agents rises to the level of outrageous governmental conduct.

Att. at 27. While we reach the result by a slightly different route, we believe that the district court's rejection of Nolan-Cooper's motion to dismiss the indictment was not in error. Our standard of review is mixed. We exercise plenary review over the district court's legal conclusions, and review any challenges to the court's factual findings for clear error. See United States v. Voigt, 89 F.3d 1050, 1064 (3d Cir. 1996).

A. The Outrageous Government Conduct Doctrine

It is the law of this circuit that a criminal defendant may raise a due process challenge to an indictment against her based on a claim that the government employed outrageous law enforcement investigative techniques. See Voigt, 89 F.3d at 1064. The notion that misconduct by the government in investigating crime could give rise to a due process violation traces its modern roots to Rochin v. California, 342 U.S. 165 (1952), in which the Court vacated the conviction of a suspected drug pusher whose stomach had been forcibly pumped so that the police could attempt to obtain incriminating evidence likely found therein. Twenty years later, in the now-famous dictum which spawned the so-called "outrageous conduct" defense, the Court affirmed that Rochin, while rare, was not a unique case:

> [W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would

11

> absolutely bar the government from invoking judicial
> processes to obtain a conviction.

United States v. Russell, 411 U.S. 423, 431-32 (1973)
(citing Rochin).

The Court revisited this dictum in Hampton v. United
States, 425 U.S. 484 (1976), in which the defendant, relying
on Russell, argued for the application of a due process
based outrageous misconduct defense. Although the Court
rejected his claim, the legal viability of the defense was
maintained by a narrow margin.4 Yet, shortly thereafter,
signs appeared that that narrow margin was beginning to
shift. In United States v. Payner, 447 U.S. 727 (1980), the
government employed a confederate to distract a bank
official while agents rifled through his briefcase and found
documents that were eventually used in the prosecution of
some of the bank's customers. The customers could not
challenge the search under the Fourth Amendment because
they did not have a cognizable privacy interest in the
briefcase, and the Court held that its supervisory power
similarly did not authorize a federal court to suppress the
evidence. See 447 U.S. at 735. Justice Powell, author of the
Hampton concurrence, wrote for the Court:

> But even if we assume that the unlawful briefcase
> search was so outrageous as to offend fundamental
> "canons of decency and fairness," . . . the fact remains
> that "[t]he limitations of the Due Process Clause . . .
> come into play only when the Government activity in
> question violates some protected right of the
> defendant."

Id. at 737 n.9 (citing Hampton, 425 U.S. at 490 (plurality
opinion) (internal citations omitted).

_____

4. Only eight justices participated in the consideration and decision of
Hampton. A three-justice plurality and a two-justice concurrence voted to
deny Hampton relief. Although the plurality favored a per se rule that, in
cases of police overinvolvement in the suspect's criminal activity, there
can be no due process violation when the defendant's predisposition to
commit the crime can be shown, the concurring justices joined with a
two-justice dissent to validate the outrageous conduct defense. See
Hampton, 495 U.S. at 491-95 (Powell, J., concurring).

While one could read the Payner dictum narrowly to say merely that a defendant may raise the outrageousness defense only when it is his or her rights that have been violated (and not, for example, the privacy rights of others), some have read Justice Powell's adoption of the Hampton plurality's language in Payner as a sign that a majority of the Court no longer believed in the viability of the defense. See United States v. Miller, 891 F.2d 1265, 1272 (7th Cir. 1989) (Easterbrook, J., concurring).[5] While Judge Easterbrook's viewpoint may ultimately prevail, and while it appears that the viability of the doctrine is hanging by a thread, see, e.g., Tucker, 28 F.3d at 1426–27, and Boyd, 55 F.3d at 241, we have, since Payner, concluded that "we have no reason to doubt that the Court continues to recognize a due process claim premised upon outrageous law enforcement investigative techniques." Voigt, 89 F.3d at 1064. Many of the other circuits have done the same. See United States v. Mosley, 965 F.2d 906, 909 (10th Cir. 1992) (collecting cases recognizing the viability of the defense from the D.C., First, Fifth, Eighth, Ninth, Tenth, and Eleventh Circuits).

While continuing to recognize, in theory, the outrageousness defense, we have nonetheless observed that, because of the extraordinary nature of the doctrine, the judiciary has been "extremely hesitant" to uphold claims that law enforcement conduct violates the Due Process clause. See Voigt, 89 F.3d at 1065; United States v. Jannotti, 673 F.2d 578, 608 (3d Cir. 1982) (in banc). The First Circuit similarly has declared the outrageous government misconduct doctrine "moribund" in light of the fact that, in practice, "courts have rejected its application with almost monotonous regularity." United States v. Santana, 6 F.3d 1, 4 (1st Cir. 1993) ("The banner of

_____

5. This conclusion is based on the fact that Justice Powell, who ostensibly cast the necessary vote to uphold the outrageousness defense in Hampton (in spite of the wishes of the plurality), made explicit reference to that plurality's reasoning in his opinion rejecting the due process claim in Payner. According to Judge Easterbrook, this adoption of the Hampton plurality's language signals that Payner was adopting the "core" of the Hampton plurality's assessment of the issue. See Miller, 891 F.2d at 1272.

13

outrageous misconduct is often raised but seldom saluted."). Indeed, since Hampton, the only opinion upholding the application of the defense is the opinion for a divided panel of this court in United States v. Twigg, 588 F.2d 373 (3d Cir. 1978).6 Twigg, however, involved a quite egregious case of government overinvolvement in which the government's undercover operative essentially concocted and conducted the entire illicit scheme. Although Twigg rightly suggested that "no justifying social objective" is served when law enforcement creates new crimes for the sake of bringing charges against a suspect that the government itself has persuaded into participating in wrongdoing, see id. at 379 (citing United States v. West, 511 F.2d 1083, 1085 (3d Cir. 1975)), it distinguished its facts from the situation where an undercover agent becomes involved in the operation after the criminal scheme has been created. See Twigg, 588 F.2d at 380. Thus, Twigg itself is of little help to Nolan-Cooper.7

While we reaffirmed the cognizability of a due process claim premised on outrageous government conduct in Voigt, supra, that case does not shed much light on how we should analyze such claims because it deals specifically with deliberate intrusions by the government into the attorney-client relationship. See Voigt, 89 F.3d at 1067. Voigt observes that the showing required to make out an outrageous conduct claim, "is by no means pellucid." Voigt, 89 F.3d at 1064. And, other courts have experienced considerable difficulty in translating "outrageous misconduct" into a defined set of behavioral norms. See Santana, 6 F.3d at 3-4. One parsing of the Russell dictum which spawned the defense suggests that that some variant of the fundamental fairness standard should be applied as

_____

6. The Eighth Circuit has also suggested that the doctrine could apply when "[t]he government agents' overzealous efforts to instigate crime also involved rather extreme and questionable measures--including the smoking of marijuana--to gain [the defendant's] confidence and lure him into committing a crime he was not otherwise ready and willing to commit." United States v. Lard, 734 F.2d 1290, 1297 (8th Cir. 1984).

7. Indeed, three judges of the in banc court in Jannotti, supra, expressed the view that Twigg should be overruled. See 673 F.2d at 610 n.17.

14

the "sounding line" for outrageousness. Id. at 4. And a survey of the case law reports that:

> Although the requirement of outrageousness has been stated in several different ways by various courts, the thrust of each of these formulations is that the challenged conduct must be shocking, outrageous, and clearly intolerable. . . . The cases make it clear that this is an extraordinary defense reserved for only the most egregious circumstances. It is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating. Nor is it intended merely as a device to circumvent the predisposition test in the entrapment defense.

Mosley, 965 F.2d at 910. Though lacking in"mathematical precision," the "shocking, outrageous, and clearly intolerable" standard provides sufficient guidance to courts attempting to assess whether particular government conduct is fundamentally unfair and thereby offends due process. See Santana, 6 F.3d at 4. It also underscores how rare application of the Due Process clause is in these circumstances.

B. Due Process Challenges Premised on Sexual Misconduct

Other courts have considered due process challenges specifically premised on alleged sexual misconduct by government operatives in the course of their investigations. Two such cases are particularly instructive on the thorny issue of how we should evaluate the use of sexual or emotional intimacy in undercover operations. Thefirst is United States v. Simpson, 813 F.2d 1462 (9th Cir. 1987), in which the FBI employed a known prostitute and heroin user as an informant in an undercover investigation of a suspected heroin dealer. After befriending the defendant, the informant, acting on her own initiative, became sexually intimate with him. The informant subsequently introduced the defendant to other undercover agents posing as potential heroin purchasers, and he was ultimately arrested after an arranged deal with one of the agents was consummated. See id. at 1464. Although the FBI did not encourage the informant to use sex in carrying out her

15

assignment, at some point the agency became aware of her sexual involvement with the defendant and decided not to terminate her participation in the investigation. See id. at 1467-68.

The defendant argued that the informant's use of sex as a means of gaining his trust through intimacy, and the government's continued employment of the informant after learning of her sexual involvement with the defendant, constituted outrageous misconduct and an invasion of his privacy and autonomy rights. The Ninth Circuit disagreed, reasoning that:

> the deceptive creation and/or exploitation of an intimate relationship does not exceed the boundary of permissible law enforcement tactics. . . . The betrayed suspect might feel foolish or insulted but a suspect cannot complain of government impropriety based on the use of deception alone. And, Simpson does not claim that he was physically or psychologically coerced into developing a close relationship with [the informant]. . . . The due process clause does not protect Simpson from voluntarily reposing his trust in one who turns out to be unworthy of it.

Id. at 1466; see also Miller, 891 F.2d at 1268 (rejecting outrageousness claim when government used informant who previously had had a sexual relationship with defendant). Importantly, however, the Simpson court stated that it "need not decide at this time whether the use of sex as a law enforcement tool would `shock the conscience' under circumstances where the government is clearly responsible, as would be the case if [the informant] had been a law enforcement officer rather than a paid informant." Id. at 1468 n.4 (emphasis added).

Despite this distinction, the Simpson court made a number of general observations about the difficulties in finding the government's use or condonation of sex by undercover operatives sufficiently outrageous so as to rise to the level of a due process violation. The court observed:

> To win a suspect's confidence, an informant must make overtures of friendship and trust and must enjoy a great deal of freedom in deciding how best to

16

establish a rapport with the suspect. In a particular case the informant might perceive a need to establish a physical as well as emotional bond with the suspect. We see no principled way to identify a fixed point along the continuum from causal physical contact to intense physical bonding beyond which the relationship becomes "shocking" when entertained by an informant. Rather, any attempt to distinguish between holding hands, hugging, kissing, engaging in sexual foreplay, and having sexual intercourse on a regular basis in order to decide when an informant has "gone too far" would require us to draw upon our peculiarly personal notions of human sexuality and social mores. The Supreme Court has rightly indicated that the outrageous conduct doctrine ought not to be applied in so subjective a manner. . . .

[W]e refuse to draw fine lines based on the level of emotional intimacy inhering in a particular informant-suspect relationship. . . . Exploiting an emotionally intimate relationship between lovers seems no more egregious than exploiting an emotionally intimate relationship between family members. Second, courts are not well equipped to assess the degree of intimacy perceived by particular suspects . . . such that individual judicial determinations that sexual relationships were sufficiently intimate to bar prosecution would lack the "universality" of condemnation required by the due process clause.

Id. at 1466–67.

While Simpson dealt only with the government's use of civilian informants (in contrast to undercover government agents), we believe that many of the same considerations that troubled the Ninth Circuit also arise here. We agree that trying to fit a subjective notion such as intimacy into the framework of the Due Process clause is an immensely difficult task. Yet, our view of this problem may differ from Simpson in at least one significant respect. Although we agree that undercover agents cannot be deprived of the ability to develop strong bonds with their targets in order for investigations to proceed, and that it is exceedingly difficult to identify the point at which physical contact and

17

emotional intimacy between an undercover agent and his or her target suspect becomes outrageous as a matter of constitutional law, we believe that such a point does exist. Therefore we must endeavor to determine whether it has been reached on the facts of this case.

The only federal appellate decision that deals specifically with a sexual relationship between a suspect and an undercover government agent is United States v. Cuervelo, 949 F.2d 559 (2d Cir. 1991). In that case, the defendant was the subject of a government operation designed to ferret out a drug conspiracy. The undercover DEA agent conducting the investigation testified that he tried to establish a "love interest" between himself and the defendant, and, according to the defendant, they had sexual relations on at least fifteen occasions. 949 F.2d at 561, 563. In addition, the agent allegedly gave the defendant gifts of money, clothes, and jewelry, and wrote her a number of love letters. Id. at 563. The defendant moved to dismiss the indictment, which the district court denied without holding an evidentiary hearing. The Second Circuit remanded, holding that a hearing was required. Id. at 569.

Based on its review of such cases as Simpson, the court stated that in order to make out a successful outrageousness claim in these circumstances, at a minimum, the defendant must show the following:

> (1) That the government consciously set out to use sex as a weapon in its investigatory arsenal, or acquiesced in such conduct for its own purposes upon learning that such a relationship existed;
>
> (2) That the government agent initiated a sexual relationship, or allowed it to continue to exist, to achieve governmental ends; and
>
> (3) That the sexual relationship took place during or close to the period covered by the indictment and was entwined with the events charged therein.

949 F.2d at 567. It is important to note that Cuervelo only held that an evidentiary hearing is warranted if the defendant raises allegations meeting these criteria. See id.

18

Yet, there is little doubt that Cuervelo envisioned these criteria as the standard to be applied on the merits since the court noted that, at the merits stage, the district court would have to consider the following questions (which essentially address the same issues):

> (a) To what extent is the undercover agent's conduct attributable to the government (i.e. did the government actively or passively acknowledge or encourage the sexual relationship)?

> (b) What purpose(s) did the agent's sexual conduct serve, if any?

> (c) Did the agent act on his own initiative or under the direction (or with the approval) of his agency?

> (d) Who initiated the relationship?

> (e) When did the alleged sexual relations end?

Cuervelo, 949 F.2d at 568.

We believe that Cuervelo's minimum criteria standard effectively captures the core issues underlying an outrageous government conduct claim premised on sexual misconduct. Accordingly, we will adopt the Cuervelo standard as the law of this circuit, with one modification. Cuervelo appears to require the defendant to introduce evidence demonstrating that the government knew that its undercover agent had engaged or was engaging in a sexual relationship with him or her. We believe that this requirement may be too stringent, and could encourage supervisory agents to turn a blind eye to the conduct of their operatives. Hence, we believe that the defendant need only show that the government consciously set out to use sex as a weapon in its investigatory arsenal, or acquiesced in such conduct for its own purposes once it knew or should have known that such a relationship existed. In addition, we emphasize that the Cuervelo criteria, while useful, should not be applied rigidly; the ultimate determination to be made on the merits is whether the government's conduct was so "shocking, outrageous, and clearly intolerable" that Due Process is offended. In most cases involving sexual misconduct by government

19

agents, however, our version of the Cuervelo factors should provide an appropriate framework for this analysis.

C. Application

We begin with the final Cuervelo factor, the timing of the alleged misconduct with respect to the period covered by the indictment. To the extent that the sexual relationship between Nolan-Cooper and Agent Oubre arose out of their ostensible money laundering business relationship, it cannot be disputed that the two were intertwined. Although Nolan-Cooper pled guilty to only one count of the superseding indictment (Count 18) that was premised on conduct which occurred after February 18, 1995, the overarching conspiracy count on which she was convicted (Count 3) alleges that the conspiracy existed until March 24, 1995 and encompasses seven alleged overt acts which occurred after February 18.

At the same time, we find it significant that the only incident of sexual intercourse found by the district court occurred within a month before the investigation was completed, and apparently well after Oubre had gathered the necessary evidence against Nolan-Cooper. This would suggest that while the sexual relationship arose out of the context of the investigation, it was not necessarily intertwined with Nolan-Cooper's offense conduct. Nolan-Cooper rejoins that we should not limit our focus to the one incident of sexual intercourse; instead, she argues that we should assess the pervasive pattern of "romancing" which she alleges Oubre undertook from virtually the outset of the undercover investigation. Since we have substantial doubts, see discussion infra, whether the alleged romancing significantly impacts our analysis, it appears that the timing of the sexual misconduct favors the government's position. Although the conduct underlying Count 18 and comprising some of the overt acts alleged in Count 5 occurred after the sexual misconduct, in the larger factual context of this case we do not believe this alters the balance or the timing question, especially since Nolan-Cooper does not seriously argue about the role of the post February 18, 1995 criminal conduct.

The remaining Cuervelo factors all relate to whether the government and/or the undercover agent used or

acquiesced in the use of the sexual relationship to serve an investigatory or other governmental end. We must inquire whether the government intentionally set out to use sex as an investigatory tool, or acquiesced in its use once it knew or should have known of the relationship. We also must determine whether the agent initiated a sexual relationship or allowed such a relationship to exist to further governmental ends. See Cuervelo, 949 F.2d at 567. As part of this inquiry we also assess whether the agent or the defendant initiated the sexual relationship. While it is ultimately a question of law for us to decide whether the agent's misconduct gives rise to a due process violation, it should be apparent that this stage of the inquiry also involves significant questions of fact. As noted previously, we review such findings for clear error.

The district court found that the sexual intercourse that occurred on February 18, 1995, was not designed to further any investigatory end. Furthermore, the district court found no evidence of any discussions among the investigating agents and their superiors concerning the use of sex as an inducement, reward or lure to obtain Nolan-Cooper's participation in the conspiracy. In sum, the district court found that there was no evidence of any "nexus or connection" between the alleged sex and the investigation. While Nolan-Cooper makes a veiled attack on these conclusions in her brief -- contending that the district court "completely ignored" that Agent Oubre's relationship with Nolan-Cooper was an integral part of the total picture -- under the applicable clear error standard of review such a challenge falls short. It is true, as Nolan-Cooper asserts, that Agent Oubre initiated the dinners, nightclubbing, and other socializing that occurred during the course of the investigation. However, the district court expressly found that Nolan-Cooper presented insufficient evidence "that the Government agents initiated or allowed a sexual relationship to blossom." Att. at 25.

Accepting, as we must, the district court's finding that the sexual intercourse between Agent Oubre and Nolan-Cooper was not designed to serve any investigatory ends, we conclude that this one instance of sexual misconduct alone does not give rise to a due process violation within

21

the extremely narrow confines of the outrageous government conduct doctrine. We simply do not believe that a one-time sexual encounter that served no investigatory purpose occurring near the end of an investigation can satisfy the difficult burden described supra . Even if it were to be concluded that Oubre's supervisors should have known that a sexual relationship existed after February 18, 1995, the record reflects that by that point the case against Nolan-Cooper had already been made and there is no proffer that any acquiescence at that point would have served any investigatory purposes. The Cuervelo framework contemplates conduct that is designed to achieve investigatory or other governmental ends; failing this, that case cannot support Nolan-Cooper's claim.8

This conclusion leaves us with Nolan-Cooper's contention that Agent Oubre's development of a "romantic" relationship in the months preceding the one incident of sexual intercourse changes the calculus. While this activity (by which we mean the dinners, nightclubbing, partying, etc.) does appear to be directed at establishing and maintaining a close relationship between agent and suspect, we are not persuaded that this particular conduct -- either alone or in tandem with the one instance of intercourse -- is egregious enough to make out a due process violation. As Simpson suggests, the mere fact that an undercover operative establishes a level of intimacy with his or her target does not alone necessarily give rise to a constitutional claim.

Like the defendant in Simpson, Nolan-Cooper was apparently quite willing to develop a close bond with Agent Oubre.9 The mere fact that Oubre acted upon this

_____

8. Moreover, this case is distinguishable in at least one important respect
from Twigg. The government here did not create the money laundering scheme; by all accounts (including her own), Nolan-Cooper had been engaged in money laundering activities well before Agent Oubre requested her services. Thus, this is not a case where law enforcement created new crimes solely for the sake of bringing charges against a suspect who was lawfully minding her own affairs. See Twigg, 588 F.2d at 379-81.

9. We have been presented with no evidence demonstrating any physical or unusual psychological coercion applied by Agent Oubre. While this is not a necessary element of a successful outrageous government conduct claim, such evidence would certainly be strongly suggestive of outrageousness. See generally Mosley, 965 F.2d at 911-12.

22

willingness cannot in itself be outrageous conduct, as the "due process clause does not protect [a defendant] from voluntarily reposing [her] trust in one who turns out to be unworthy of it." Simpson, 813 F.2d at 1466. Moreover, we observe that much of the "romantic" conduct alleged here, on its face, is not that different from conduct by undercover operatives which we regularly find acceptable in cases where there is no apparent romantic undercurrent. It is not at all uncommon to find a heterosexual male undercover agent providing lavish entertainment to a heterosexual male suspect as a means of establishing rapport. Cf. Simpson, 813 F.2d at 1466 (noting that informants must "enjoy a great deal of freedom" in deciding how to establish rapport with suspects). We cannot agree that the emotional intimacy that may inure in the bond that an undercover agent develops with a suspect, without more, can satisfy the narrow confines of the outrageous government conduct doctrine.

In sum, that "something more" is not present on the facts as found by the district court. Since Nolan-Cooper cannot satisfy our version of the Cuervelo analysis, we will affirm the order of the district court denying Nolan-Cooper's motion to dismiss the indictment.10

_____

10. The government asserts that Hampton and Payner also require Nolan-Cooper to demonstrate that the government interfered with a specific constitutionally protected interest in order to make out her due process claim. In addition, the government contends that, under Voigt, an outrageous government conduct claim can only be successful if the defendant can show that she has been prejudiced by the government's acts. It is the government's position that Nolan-Cooper has failed to make either showing here. Since we affirm the district court's order on other grounds, we need not reach these issues.

We also note that Nolan-Cooper's main brief makes reference to a "privacy" interest:

> The court gave no weight in its opinion to the government's gross and unprecedented violation of Nolan-Cooper's rights to privacy.

However, it goes on to explain the claim as sounding in due process terms.

> Consideration of the totality of the government's misconduct shows that it constituted a serious invasion into Nolan-Cooper's

23

III. Breach of the Plea Agreement

Nolan-Cooper contends that the government breached several provisions of the plea bargain to which she agreed following the district court's denial of her motion to dismiss. In her submission, the government failed to uphold its end of the deal when it recommended to the district court a sentence greater than it had promised to recommend, and when it took adverse positions on Sentencing Guideline adjustment provisions when it had agreed not to do so. Pursuant to the approach laid out in United States v. Moscahlaidis, 868 F.2d 1357, 1360 (3d Cir. 1989), our analysis will proceed in three steps. First, we will identify the terms of the agreement and the alleged improper conduct of the government. Second, we will determine whether the government violated its obligations under the plea agreement. Third, we will fashion an appropriate remedy for any violations that occurred. Nolan-Cooper has pointed to, and we will address, three separate breaches.

Before we assess the present claims, however, we will set forth the applicable legal precepts, which are well-established. The basic statement of the law comes from Santobello v. New York, 404 U.S. 257, 262-63 (1971):

> This phase of the process of criminal justice, and the adjudicative element inherent in accepting a plea of guilty, must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the

_____

> fundamental constitutional rights of privacy, and therefore, a due process violation.

In her reply brief, in contrast to the main brief, the "Privacy" argument has a heading: "The government's conduct violated Nolan-Cooper's right to privacy." However, the discussion that follows lies within the same framework as the main brief -- the outrageous conduct issue which is cast in due process terms. Since we have disposed of that issue at some length supra, we need not address it further.

24

> inducement or consideration, such promise must be fulfilled.

Because the defendant, by entering into the plea, surrenders a number of her constitutional rights, "courts are compelled to scrutinize closely the promise made by the government in order to determine whether it has been performed." United States v. Hayes, 946 F.2d 230, 233 (3d Cir. 1991). Moreover, "the doctrine that the government must adhere to its bargain in the plea agreement is so fundamental that even though the government's breach is inadvertent and the breach probably did not influence the judge in the sentence imposed, due process and equity require that the sentence be vacated." Id. (internal quotations omitted).

Plea agreements, although arising in a criminal context, are analyzed under contract law standards. See Moscahlaidis, 868 F.2d at 1361. In determining whether the plea agreement has been breached, courts must determine "whether the government's conduct is inconsistent with what was reasonably understood by the defendant when entering the plea of guilty." United States v. Badaracco, 954 F.2d 928, 939 (3d Cir. 1992) (citing United States v. Nelson, 837 F.2d 1519, 1521-22 (11th Cir. 1988)). Accordingly, we will not permit the government to rely upon a "rigidly literal" approach to the construction of the terms of the plea agreement. See Moscahlaidis, 868 F.2d at 1361. For example, we have recently held that even when the government is given wide discretion whether to file a U.S.S.G. S 5K1.1 (substantial assistance) motion pursuant to a plea agreement, the district court is empowered to examine for "good faith" the government's refusal to file such a motion. See United States v. Isaac, 141 F.3d 477, 483-84 (3d Cir. 1998).

A. The Government's Position on Guideline Adjustments

> 1. Use of a Special Skill [The Attorney's Escrow Account Issue].

The government stipulated in the plea agreement that it would "not oppose" Nolan-Cooper's position at sentencing that certain guideline adjustments should not apply.

25

Included in this list was the "use of a special skill" enhancement contained in U.S.S.G. S 3B1.3 (1996), which calls for a two-point offense level increase if the defendant "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." S 3B1.3. Although the written plea agreement did not specifically mention this guideline provision, the government conceded in its sentencing memorandum that the special skill provision would be covered by the terms of the written agreement. At the sentencing hearing, however, the following colloquy occurred:

> The Government: [I]n accordance with the plea agreement, the Government is not going to comment on the applicability of either the abuse of special skill or with respect to the obstruction in this case. However, I will comment briefly as to the facts in accordance with the plea agreement and with respect to the abuse of special skill I would point out to the Court that on several occasions the defendant in this case specifically mentioned her escrow account as a resource and as a way that she could specially help hide the defendant or the agent's money. . . .

> The Court: [L]et me ask you something before you go any further here. What is your agreement with the defendant? It may be better that you just let this go rather than to skirt around the edges to what you can do and not do. If you're going to simply point something that it already on the record, we don't really need that.

> The Government: Pardon, your honor.

> The Court: As to -- as to those and I'm not going to consider your comments on those two issues.

App. at 405-06. Nolan-Cooper contends that the government's statement here violates the plea agreement.

The government responds that these comments do not breach the special skill provision of the plea agreement because the agreement also contains a clause reserving to the government the right "to comment on the evidence and circumstances of the case and bring to the Court's

26

attention all facts relevant to sentencing." App. at 262. The government submits that its comments were made pursuant to and within the scope of this clause. Nolan-Cooper rejoins that the government's position is untenable under Badaracco, supra. We agree.

In Badaracco, the government stipulated that the defendant's conduct "did not involve more than minimal planning" and thus would not warrant an enhancement under U.S.S.G. S 2F1.1(b)(2). That section provides for a two-level enhancement when "significant affirmative steps were taken to conceal the offense." U.S.S.G. SS 1B1.1 app. note 1(f); 2F1.1(b)(2). At the sentencing hearing, the government stated that Badaracco had taken "an affirmative step . . . indicating that he was concealing something." Badaracco, 954 F.2d at 939. We found that this comment provided the district court with a basis upon which to ignore or reject the parties' stipulation and apply the enhancement. See id. at 940. Accordingly, we held that the government had "violated the spirit, if not the letter of the plea agreement." Id. Despite the government's contention that it was merely exercising its reserved right under the plea agreement to inform the court of the"nature and extent" of Badaracco's activities, we held that there had been a breach. Id.

The present case falls squarely under Badaracco. The government's statement about Nolan-Cooper's use of the escrow account plainly could have given the court a basis upon which to reject the defendant's argument that the special skill adjustment should not apply. Indeed, the statement that Nolan-Cooper's escrow account was "a way that she could specially help hide . . . the agent's money," arguably tracks the guideline requirement that a special skill must "significantly facilitate[ ] the commission or concealment of the offense. . . ." See S 3B1.3. Furthermore, the government's proffered justification -- that it was only commenting on the facts pursuant to the reserved right-to-comment clause -- is almost identical to the justification that we rejected in Badaracco.

Moreover, we have held previously that a promise to take no position on an issue (which, to a defendant, is the functional equivalent of a promise not to oppose) is a

27

promise not to attempt to influence the defendant's sentence on that particular issue. See Moscahlaidis, 868 F.2d at 1362; see also United States v. Brye, ___ F.3d ___, 1998 WL 318563 (10th Cir. 1998) (finding breach of plea agreement based on statements by government which implicitly argued against downward departure when government had promised to take no position). The government cannot, consistent with Moscahlaidis, rely on a general provision of the plea agreement permitting it to comment on the facts of the case to defeat the purpose of a specific provision requiring it not to oppose the defendant's position on the applicability of a particular adjustment.

The government also argues that its comments were necessary because they were made in response to "a number of averments and factual representations" by defense counsel with regard to Nolan-Cooper's non-use of a special skill. While the plea agreement permits the government to "rebut any statement made by or on behalf of the defendant at sentencing," the government's concession not to oppose Nolan-Cooper's position on the applicability of the special skill enhancement would be meaningless if we permitted the government to respond to the facts as presented by the defendant on this issue with remarks that clearly "meant to serve as a possible basis for the district court to ignore the stipulation in the plea agreement." Badaracco, 954 F.2d at 941. As the Tenth Circuit recently noted in Brye:

> [T]he government breaches an agreement "not to oppose" a motion when it makes statements that do more than merely state facts or simply validate facts found in the Presentence Report and provide a legal characterization of those facts or argue the effect of those facts to the sentencing judge.

Brye, ___ F.3d ___, 1998 WL 318563 at *3 (citing United States v. Hawley, 93 F.3d 682, 693 (10th Cir. 1996) (internal quotation marks omitted).

This may mean that the government must exercise the option of silence even if it disagrees with the defendant's characterization of the facts.11 "As is the case with any contract, the government is not free to breach its agreement

_____

11. This is especially so when those facts are either in the factual record
or are discussed in the presentence report prepared by the probation office, and are thereby known to the court.

with a defendant because it decides after the fact that it has made a bad bargain." Badaracco, 954 F.2d at 941. On this basis we find that the government breached the special skill clause of the plea agreement.

2. Acceptance of Responsibility.

For essentially the same reasons, we also agree with Nolan-Cooper that the government breached its promise not to oppose her request for a three-level downward adjustment for acceptance of responsibility. See U.S.S.G. S 3E1.1(b). The government stated at the sentencing hearing:

> Your Honor, with respect to the acceptance of responsibility I feel compelled to comment to the Court that with reference to the proffers that defendant gave, the several proffers, the Government does not believe that the defendant gave complete information. And that has been made known to the defense on more than one occasion. . . . There are no other facts to support a third point that I am aware of, your Honor. . . . I would not have commented on this other than the fact that the defense, both in their sentencing memorandum as well as today, commented on the fact that the defendant provided complete information and with referencing [sic] the proffers.

App. at 404-05. As above, we find that the government's comments provided the court with a basis upon which to reject Nolan-Cooper's claim that she should receive the full acceptance of responsibility adjustment. This violates Badaracco.

The government suggests that this analysis should be altered because, at at least one point during the relevant portion of the sentencing hearing, the government's comments were made in response to a question by the court. We disagree. While such questions may place the government in an uncomfortable situation, it still must inform the court that it cannot answer the question without breaching its plea agreement. Sometimes "the better part of valor is discretion." William Shakespeare, King Henry the Fourth, Part I, act V, scene iv, line 12.

29

B. Guideline Range Stipulation

Nolan-Cooper additionally contends that the government breached the plea agreement by recommending to the court a sentence outside the stipulated Guideline range. In the plea agreement, the government expressly represented that it would "make whatever sentencing recommendation it deems appropriate within the stipulated Sentencing Guideline range of 41 to 51 months imprisonment." App. at 262. The district court, however, determined at the sentencing hearing that the applicable guideline range was actually 63 to 78 months, and denied Nolan-Cooper's motion for a downward departure from this range. App. 418-51. After this finding was explained to the parties, additional witnesses were called, and the government was subsequently given the opportunity to present its arguments on Nolan-Cooper's sentencing to the court. The government made the following statement:

> [These were] crimes committed by an individual who knew better, who was not forced either by economics or otherwise, any form of duress, to commit these crimes, she chose to commit these crimes knowingly and deliberately.

> [I]t is difficult even now as I stand before this Court for anyone, I believe, not to be shocked by the defendant's callous and calculating attempts to subvert the law. That would be the case whether or not she was a lawyer, but the fact that she is a lawyer, someone who swore to uphold the law, makes this case -- the actions of this defendant particular [sic] egregious, that she in fact flaunted the fact that she had special tools, the escrow account, which she could use as a resource to break the law.

App. at 477-78. At the conclusion of its comments, the government stated that "the Judge should sentence the defendant to the higher end of the guidelines based on her conduct." App. at 479 (emphasis added).

Defendant's counsel immediately objected, claiming that the government had breached the plea agreement. The following colloquy ensued:

30

        The Government: Your honor, I stand corrected on
        that. When I said the higher end of the guideline range,
        I meant within the plea agreement and I misspoke on
        that, so that will stand corrected.

        The Court: Well, it can (sic) be within the plea
        agreement, can't it? Doesn't it have to be at least 63
        months?

        The Government: Yes, your Honor, but I think for
        purposes of argument today, I think I can stand before
        the Court and argue the higher end of the guideline as
        stipulated to.

        The Court: Okay, I will disregard the Government's
        recommendation since, frankly, it seems to be a little
        schizophrenic here as to who is recommending what to
        whom when. So, we will give no weight to the
        Government's recommendation in this case and I will
        take into account [defense counsel] Mr. Howard's
        recommendation to that.

App. at 479-80. Nolan-Cooper contends that the
government violated the plea agreement in two ways. First,
she contends that the government's lengthy statement
preceding its sentence recommendation -- in which the
government characterized her in a highly negative way and
implicitly advocated a severe sentence -- itself constitutes
a breach. Second, Nolan-Cooper asserts that, despite the
subsequent correction, the government's original
recommendation of a sentence at "the higher end of the
guidelines" was also a breach. We take up these arguments
in turn.

As we said in Badaracco, we must examine what the
defendant reasonably understood she would be receiving
from the government in return for her plea of guilty. See
Badaracco, 954 F.2d at 939. We believe, as a basic matter,
that it was entirely reasonable for Nolan-Cooper to
understand that the government's promise to recommend a
sentence between 41 and 51 months included a promise
not to advocate the imposition of a sentence longer than 51
months. See United States v. Taylor, 77 F.3d 368, 370
(11th Cir. 1996). Advocacy "of a position requiring a greater
sentence is flatly inconsistent with recommendation of a

31

lesser sentence." Id. To resolve Nolan-Cooper's claim that the government's comments preceding its recommendation violated the plea agreement, we must determine whether those comments constitute impermissible "advocacy."

The First Circuit faced an almost identical situation in United States v. Canada, 960 F.2d 263 (1st Cir. 1992). In that case, the government agreed to recommend a sentence 36 months in duration. At the sentencing hearing, however, the district court determined that the applicable guideline range was 46 to 57 months. After this determination was made, the government stated, inter alia:

> [T]he plea agreement . . . indicates that the government would recommend a period of incarceration of 36 months, which under the calculations, that at that time under the information that was known to the government . . . was the upper end of the guideline range. That is in the plea agreement.
>
> The government feels a substantial period of incarceration in this case [sic], for the reason the Court has already indicated: this is a massive fraud perpetrated on a large number of individuals over a long period of time. . . .
>
> It is important, the government feels, that a very strong message be sent by the Court. This is one of the largest, if not the largest advance fee scheme, which the Office of the United States Attorney has been involved in in the last several years.

960 F.2d at 269. After making a few more comments regarding restitution, the government remarked "I begged the question as to the specific amount of the period of incarceration here--" at which point the district court interjected "I think you are stuck with the plea agreement." Id. The government replied, "I believe I am, your Honor." Id.

The First Circuit noted that, while the government informed the district court of the agreed-upon 36 month sentence, it never affirmatively recommended such a sentence and that its comments "seemed to undercut such a recommendation." Id. at 268. The court concluded that the government's comments, though not explicitly

32

repudiating the plea agreement, violated Santobello. Id. at 269. In reaching this conclusion, the court held that the government's "overall conduct must be reasonably consistent with making such a recommendation, rather than the reverse." Id. We agree.

We considered a similar situation in Hayes, supra. In that case, the government agreed to "make no recommendation as to the specific sentence that the Court should impose," yet in its sentencing memorandum advocated "a sentence within the standard range of the guidelines as to Count One . . . and a lengthy period of incarceration on the nonguideline counts." Hayes, 946 F.2d at 232. While we recognized that a promise to make no recommendation "is a lesser commitment [than a promise to take no position at all] and permits some latitude in the prosecutor to influence the sentence without actually commenting on the sentence itself," we concluded that the specific comments here clearly clashed with the plain language of the agreement, and we held for the defendant. Id. at 234–35.

We believe that the same principles apply here. Once the district court had determined that the lower end of the applicable sentencing guideline range was higher than the high end of Nolan-Cooper's stipulated range, the government essentially had received more than it had bargained for when it entered into the plea agreement. Since the government was prohibited by the agreement from recommending a sentence longer than 51 months, once the district court determined that the low end of the applicable range was 68 months, the government should have said nothing further. As in Canada, the government's subsequent comments can only be interpreted as an attempt to influence the court to impose a longer sentence than stipulated to in the agreement, and is therefore a breach.

To illustrate the limits of our holding, we identify a possible exception to this rule. If the government otherwise adheres to the terms of the plea agreement, and the court independently determines that the applicable range is higher than that stipulated to, it would not appear to be a breach if the government states only that in light of the

33

changed circumstances, the court should impose the lowest end of the applicable range. But that was not the case here. There is no way that the government's comments could possibly be construed as advocating for the lower half of the range, let alone the lowest possible term of imprisonment. To the contrary, the government's professed "shock" at Nolan-Cooper's "callous and calculating attempts to subvert the law" can only be reasonably read as advocating a severe sentence.

We emphasize that our conclusion is not based on a belief that the government acted in any bad faith, but rather on an objective interpretation of the import of the government's remarks within the context of the district court's previous determination regarding the applicable guideline range. In these circumstances, the most prudent course would be for the government, if given an opportunity to comment, to inform the court that it is bound by the plea agreement and therefore will not make any further remarks. Of course, if the plea agreement permits the government to correct any misstatement of facts made by the defendant during her colloquy, the government would be within its power to do so -- so long as any statement it makes does not undermine its agreed-upon position. See Canada, 960 F.2d at 270. The government should exercise its power to comment in these circumstances with extreme discretion, e.g. to correct blatant misstatements by the defendant. Of course, if sentencing issues other than the amount of incarceration to be imposed are still undetermined, the government would be permitted to make any statements relevant to those issues, so long as those statements do not otherwise undermine other provisions of the plea agreement.

Nolan-Cooper's second argument (i.e. that the government's initial misstatement of its sentencing recommendation also constitutes a breach) presents a number of difficult questions. While we are convinced that the government's initial misstatement was just that -- a misstatement -- it is similarly true that, under our case law, even inadvertent breaches can require vacatur of the sentence. See Hayes, 946 F.2d at 233. While we have stressed that the government must choose its words at a

plea hearing very carefully, we also recognize that the dynamics of an extemporaneous courtroom colloquy can lead to missteps, and we are reluctant to adopt a strict rule that would characterize an immediately corrected good-faith misstatement as a breach. But see United States v. Kurkculer, 918 F.2d 295 (1st Cir. 1990) (finding breach of plea agreement when government recommended sentence in violation of agreement although government withdrew its recommendation and then recommended agreed-upon sentence after continuance). It is uncertain whether our reluctance is precluded by our holding in Hayes that even inadvertent breaches having no effect on the court still require vacatur of the sentence. See Hayes, 946 F.2d at 233. However, since we find that the government's commentary preceding its misstated recommendation itself constitutes a breach, we need not reach this issue.

C. Remedy

When the government breaches a plea agreement, the general rule is to remand the case to the district court for a determination whether to grant specific performance or to allow withdrawal of the plea. See Badaracco, 954 F.2d at 941 (citing Moscahlaidis, 868 F.2d at 1363). Nolan-Cooper has represented in her brief and at oral argument that she does not wish to withdraw her plea, and we do not believe that the district court should be able to impose such a remedy on the defendant over her objections on remand. As the First Circuit stated in Kurkculer:

> Specific performance is feasible and is a lesser burden on the government and defendant. Further, permitting a judge to vacate a plea over defendant's objection on breach by the prosecution allows the government to back out of its agreement at will and obtain a trial. Given nothing more than the prosecutor's breach, the circumstances do not "require" a new trial.

918 F.2d at 302.

It is also the rule in this circuit that if specific performance is the applicable remedy, the defendant must be resentenced by a different district judge than the one who presided over the now-vacated original sentence. See Hayes, 946 F.2d at 236. This result obtains irrespective of

35

the fact that the need for resentencing was caused by the government and is not attributable to any error by the sentencing judge. See id. (citing United States v. Corsentino, 685 F.2d 48, 52 (2d Cir. 1982)). The only remaining question is whether the case should be remanded for a full resentencing, or whether the remand should be limited to the provisions affected by the government's breach. The parties agreed that if we found a breach of the plea bargain, the case should be remanded for a full resentencing, and we believe that this is the correct result. Thus, we will vacate the sentence imposed and remand the case to the district court for resentencing before a different judge, pursuant to the plea agreement.

IV. Downward Departure Based on
Government Misconduct

Nolan-Cooper argued to the district court at sentencing that a downward departure was warranted in this case because the government's misconduct (i.e. Agent Oubre's cultivation and consummation of a sexual relationship) during the investigation was sufficiently unusual to take this case outside the "heartland" of the applicable guidelines. The district court rejected this argument and denied her motion for a departure, stating:

> The Court has already concluded that Ms. Nolan-Cooper was not induced to commit or enlarge the crime as a result of Agent Oubre's engaging in sexual relations with her. In fact, all counts against Ms. Nolan-Cooper that stemmed from actions taken by her after the incident are to be dismissed by the government at sentencing, pursuant to the plea agreement. To base a downward departure on the defendant's reasoning would result in a sentencing windfall to the defendant for no logical or policy rationale.
>
> Therefore, the Court concludes that Ms. Nolan-Cooper should be sentenced in accordance with the crime to which she has pled guilty. None of the purposes of the current sentencing scheme would be served by this departure. Absent a due process violation or a showing

36

> that the government misconduct enlarged the scope or scale of a crime, and resulted in an increased sentence, a departure is not warranted.

Att. at 80. According to Nolan-Cooper, this denial was premised on the court's conclusion that the government's misconduct provided a legally insufficient basis for a downward departure. The government contends that the court did not rule on legal grounds, but instead properly considered Nolan-Cooper's departure argument, and, based on the facts, ruled in its discretion that a departure was not warranted.

The first paragraph of the district court's statement, rescribed above, lends credence to the government's argument that the court made a discretionary decision based on facts found after extensive hearings, while the second paragraph strongly supports Nolan-Cooper's position. We lack jurisdiction to review a district court's refusal to depart downward when, aware that it has the authority to depart, it nonetheless determines that a departure is not warranted, see United States v. Sally, 116 F.3d 76, 78 (3d Cir. 1997) (citing United States v. McQuilkin, 97 F.3d 723, 729 (3d Cir. 1996), cert. denied 117 S. Ct. 2413 (1997)), and thus if the government is correct we would have no jurisdiction to consider Nolan-Cooper's departure arguments on appeal. It appears to us, however, more plausible that the district court believed that it was legally precluded from departing in the present circumstances.

Since we have concluded that the government's violation of the plea agreement requires vacatur of Nolan-Cooper's entire sentence and a remand for resentencing before a different judge of the district court, we need not definitively decide this issue. However, if the court did hold-- and it appears that it did -- that it was precluded from departing, we believe that such a holding would be in error. Since we presume that Nolan-Cooper will move for a departure on the same grounds at her resentencing, we think it appropriate for us to discuss the merits of Nolan-Cooper's departure claim for the guidance of the district court on remand.

37

The question on the merits can be easily restated. The district court held that a departure would not be warranted absent "a due process violation or a showing that the government misconduct enlarged the scope or scale of the crime." In effect, we understand the latter clause to mean that a departure would not be warranted unless the government's misconduct was related to the guilt of the defendant. This formulation presents the legal question whether potential departures based on improper investigative techniques that are unrelated (or only tangentially related) to the defendant's guilt should be categorically excluded under the applicable Supreme Court standards.

The now-familiar framework for analyzing the legal propriety of downward departure decisions was established by the Supreme Court in Koon v. United States, 518 U.S. 81 (1996). In Koon, the Court identified the three basic categories of departure factors set forth in the Guidelines: those that are encouraged, those that are discouraged, and those that are forbidden. See id. at 95-96. If a particular factor is not mentioned in the Guidelines, however, that does not mean that a departure based on that factor is precluded. To the contrary, Koon states that "a federal court's examination of whether a factor can ever be an appropriate basis for departure is limited to determining whether the Commission has proscribed, as a categorical matter, consideration of the factor." 518 U.S. at 109.

As the Second Circuit has held, absent express prohibition by the Commission, a sentencing court "is free to consider, in an unusual case, whether or not the factors that make it unusual . . . are present in sufficient kind or degree to warrant a departure." United States v. Core, 125 F.3d 74, 77 (2d Cir. 1997) (citing United States v. Rivera, 994 F.2d 942, 949 (1st Cir. 1993), cert. denied sub nom. Reyes v. United States, ___ U.S. ___, 118 S. Ct. 735 (1998). This would appear to prohibit courts from categorically excluding any departure factor not expressly prohibited by the Guidelines. See United States v. Mendoza, 121 F.3d 510, 513 (9th Cir. 1997) ("We are not at liberty, after Koon, to create additional categories of factors that we deem inappropriate as grounds for departure in every

38

circumstance."); Core, 125 F.3d at 76-77; United States v. Brock, 108 F.3d 31, 34 (4th Cir. 1997).

The factors categorically excluded by the Guidelines are few. They include: race, sex, national origin, creed, religion and socio-economic status, see U.S.S.G.S 5H1.10; lack of guidance as a youth, see S 5H1.12; drug or alcohol dependency, see S 5H1.4; and economic hardship, see S 5K2.12. Notably, this list does not include government investigatory misconduct. Thus, applying the Koon-based analysis employed by the Mendoza and Core courts, we would reach the conclusion that departures based on investigative misconduct unrelated (or only tangentially related) to the guilt of the defendant are not expressly precluded from consideration for departure by the Guidelines, and should not be categorically proscribed.12

_____

12. We recognize that our decision in United States v. Haut, 107 F.3d 213 (3d Cir.), cert. denied 118 S. Ct. 130 (1997), arguably militates against this Koon-driven result. In Haut, we held that the district court erred in departing downward based on its belief that the government's witnesses were of dubious credibility and therefore that the jury's verdict
was therefore equally dubious. See 107 F.3d at 219. But the departure in that case ran contrary to a basic tenet of our jury system that the district court cannot substitute its judgment of the facts and credibility of the witnesses for that of the jury. See id. at 220. For that reason, the
Haut panel viewed such a departure factor as "categorically inappropriate" and stated that:

> We are mindful that Koon explains that "with few exceptions, departure factors should not be ruled out on a categorical basis." Nonetheless, the instant case involves one of those few exceptions.

Id. at 219-20 (citations omitted). This passage appears to suggest that, consistent with Koon, courts can still categorically exclude departure factors.

Not surprisingly, this statement, made shortly after Koon, has caused some difficulty and confusion, see, e.g., United States v. Sutton, 973 F. Supp. 488, 493 n.4 (D.N.J. 1997), aff'd, ___ F.3d ___ (3d Cir. May 21, 1998), and has not been cited elsewhere, apparently because the plain language of Koon, see 518 U.S. at 109, holds that the courts are not permitted to categorically exclude departure factors not specifically excluded by the Guidelines themselves. Because the precise departure factor in Haut was so fundamentally at odds with a foundational principle of our jury trial system -- the allocation of competency

Therefore, the district court's apparent holding that it was precluded from departing here would be in error.13

_____

determinations -- Haut must be seen as a unique decision where a basic principle of our legal system rendered that departure factor to be an abuse of discretion under any circumstances. Such a bedrock principle is not at issue in the overwhelming majority of departure cases, and is not at issue here. In that regard, we read Haut as limited to its facts, and therefore not abrogating Koon's mandate that we are not permitted to look beyond the Guidelines to determine whether a categorical exclusion is appropriate here.

We note that in a recent D.C. Circuit case, Judge Silberman, writing in dissent, suggests that certain factors may be categorically excluded from the consideration of sentencing courts despite Koon because those factors are precluded by more fundamental principles of law. See United States v. Rhodes, ___ F.3d ___, 1998 WL 321541, *10 (D.C. Cir. 1998) (Silberman, J., dissenting). In Rhodes, Judge Silberman argued that a district court may not consider a prisoner's post-conviction conduct when it resentences that prisoner following an appeal because the very passage of the Sentencing Reform Act of 1984 itself implicitly precluded such consideration. Id. We observe that it is possible to read Haut as having been decided on a similar basis.

13. We note that this result is consistent with our pre-Koon precedents, most notably United States v. Lieberman, 971 F.2d 989 (3d Cir. 1992), and United States v. Monaco, 23 F.3d 793 (3d Cir. 1994). In Lieberman, we considered whether the Guidelines preclude a departure when the government's manipulation of the indictment, though not done in bad faith, would result in a particular defendant being sentenced disproportionately to other similarly situated defendants. Lieberman, 971 F.2d at 996-98. In that case, the government manipulated the indictment in such a fashion as to make impossible the grouping of the defendant's two related offenses under the Guidelines. We held that the district court was permitted to downwardly depart in such circumstances. Id. at 998.

In Monaco, the defendant, the president of a company which had been awarded a Department of Defense contract, pleaded guilty to conspiracy in connection with a fraudulent billing scheme. To accomplish this scheme, the defendant had directed his son (who worked for the company) to prepare false labor sheets. As a consequence, the defendant's son was also indicted, and ultimately pleaded guilty to aiding and abetting a false statement. At sentencing, the district court departed downward, based in part upon the mental anguish the defendant felt at seeing his son, an otherwise law-abiding citizen, convicted of a crime because of his father's felonious scheme. Id. at 799-80.

40

For a departure based on a factor unmentioned in the Guidelines (such as improper investigatory techniques) to be permitted, however, it must comply with U.S.S.G. S 5K2.0. Under that section, a sentencing court may "impose a sentence outside the range established by the applicable guideline, if the court finds `that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' " U.S.S.G. S 5K2.0 (policy statement). Koon instructs that, in order to determine whether a departure shall be permitted under S 5K2.0, courts must, "after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, . . . decide whether it [the departure factor] is sufficient to take the case out of the Guidelines' heartland." 518 U.S. at 96 (citations omitted). Moreover, Koon states that, in conducting this "heartland" analysis, we must "bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be`highly infrequent.' " Id. Nolan-Cooper contends that various aspects of the misconduct by the government agents detailed above take this case out of the heartland. Primarily, she contends that Agent Oubre's manipulation of her romantic and sexual life constitutes an unprecedented invasion well-beyond the manipulation and trickery that the typical subject of a sting operation must endure. If Nolan-Cooper renews her motion for a downward departure

_____

Although not considered by the Sentencing Commission, we did not believe that the Guidelines foreclosed the possibility of a downward departure under these circumstances. Id. at 801. The government argued, however, that since the defendant's guilt was not in any way diminished by involving his son in the scheme, any anguish he felt would not be mitigating and therefore should not be permitted to ground a departure. Id. at 802. We rejected this argument, citing Lieberman in support of the proposition that "reduced moral culpability is not the only permissible basis for a downward departure." Id. Accordingly, we concluded that "certain factors unrelated to guilt may be relevant for departure purposes in extraordinary circumstances." Id. at 803.

41

on this basis on remand, the district court will have to decide whether the misconduct found here is sufficient to take this case outside the Guidelines' heartland.14

          V. Conclusion

For the foregoing reasons, we will affirm the order of the district court rejecting defendant's motion to dismiss the indictment for outrageous government misconduct. We will, however, vacate the defendant's sentence and remand for a new sentencing consistent with this opinion before a different judge of the district court.

_____

14. Nolan-Cooper also moved for a downward departure based on the contention that the government controlled the amount of money laundered during the course of Agent Oubre's investigation, and was thus able to inflate the severity of the sentence that she received under the Guidelines. Nolan-Cooper presented the district court with two related claims on this ground: (1) that the government's conduct was improper (and deserving of a departure) under the "sentencing factor manipulation" doctrine; and (2) that the government's determination of the amount of funds laundered took this case outside of the money laundering offense guidelines. The district court denied the motion for a downward departure, finding that:

> [T]here is no evidence that the undercover agent pressured Ms. Nolan-Cooper to engage in the money laundering, or influenced her to launder more money than she was ordinarily willing to launder. . . . The Court concludes that this thirteen month investigation which involved the laundering of nearly $200,000 was neither extended nor expanded for improper purposes and, therefore, the government did not engage in conduct even approaching the "extraordinary misconduct" required to show sentence factor manipulation.

Att. at 84. Nolan-Cooper does not now contend that the court erroneously rejected her "sentencing factor manipulation" claim. Rather, she asserts that the court failed to consider the "heartland" claim, violating what she terms the court's duty to consider the nature and circumstances of the offense, necessitating a remand for that reason. We find no merit to this argument.

42

RENDELL, Circuit Judge, concurring:

I concur in the foregoing opinion, and yet am troubled by the nature of the government's conduct in this case, which might easily be said to involve conduct which "falls below standards, to which common feelings respond, for the proper use of governmental power." Sherman v. United States, 356 U.S. 369, 382 (1958) (Frankfurter, J., concurring). Particularly troublesome is the nature and extent of expenditures for wining and dining Nolan-Cooper to "cement" the money-laundering relationship. The agents entertained her with suites at the Four Seasons and dinners at lavish restaurants, followed by club-hopping until the wee hours. In total, the expenses incurred in connection with the undercover investigation exceeded $50,000 (App. at 1146.) If this is standard operating procedure for government stings, it is little wonder that our citizens often question how their government spends taxpayers' dollars. I am less troubled as to the results in this case, however, because the inquiries set forth in United States v. Cuervelo, 949 F.2d 559, 567 (2d Cir. 1991), that we have adopted provide the essential test for determining whether the government's conduct gives rise to a due process violation that bars prosecution. In United States v. Twigg, the defendant posed the same question as we address here, namely, was "the nature and extent of police involvement in this crime . . . so overreaching as to bar prosecution of the defendants as a matter of due process of law." 588 F.2d 373, 377 (3d Cir. 1978). Employing the Cuervelo test as the means of determining the answer to this question in this unique type of case, we must respond in the negative. I view the totality of the government's conduct as having been reprehensible, but, as it takes two to tango, Nolan-Cooper's conduct was not the result of overreaching or overinvolvement by the government.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit