UNITED STATES of America,
Plaintiff,

v.

Calvin DYESS, Eric Dewayne Spencer, Michael Jason Bartram, and Orange Dyess, Defendants.

No. CRIM. 2:99–00012–01, CRIM. 2:99–00012–03, CRIM. 2:99–00012–10, CRIM. 2:99–00012–12.

United States District Court,
S.D. West Virginia.
Charleston Division.

Dec. 17, 2003.

John Hackney, Jr., Law Office of John Hackney, Jr., Charleston, WV, Jane Moran, Williamson, WV, for Calvin Douglas Dyess.

Calvin Douglas Dyess, pro se, Beaumont, TX.

Thomas J. Gillooly, Charleston, WV, for Eric Dewayne Spencer.

Eric Dewayne Spencer, pro se, Lexington, KY.

Michael Jason Bartram, pro se, Ashland, KY.

Robert Allen Ratliff, Roberts Shields & Green, Mobile, AL, for Michael Jason Bartram.

Orange Dyess, pro se, Ashland, KY.

Dennis H. Curry, Spencer, WV, for Orange Dyess.

Michael J. Elston, Sp. Atty., Kimberly R. Pedersen, Sp. Atty., Brian D. Miller,

U.S. Dept of Justice, Alexandria, VA, for U.S.

## MEMORANDUM OPINION AND ORDER

HADEN, District Judge.

Pending are Defendants' motions for various forms of relief in this case, which was remanded from our Court of Appeals before decision on direct appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Criminal Cases

On February 17, 1999 a federal grand jury in this district returned a thirteen-count Superseding Indictment charging Calvin Douglas Dyess (Calvin), Eric Dewayne Spencer (Spencer), Orange Dyess (Orange), Michael Jason Bartram (Bartram) and nine co-defendants with conspiracy to distribute and possess with intent to distribute cocaine base, cocaine and marijuana and additional various drug-related crimes, the income from which was estimated to exceed three million dollars. Rachel Ursala Dyess (Ursala), Calvin's wife, was named as an unindicted co-conspirator in the conspiracy count. Ursala and Calvin were charged in *Count* 3 with money laundering.[1]

On March 30, 1999 Ursala pled guilty to *Count* 3 of the Superseding Indictment, conspiracy to launder money. On April 23,

1999 Bartram pled guilty to a one-count information charging distribution of cocaine base in violation of 21 U.S.C. § 841(a)(1). On April 21, 1999 Calvin pled guilty to *Counts* Two and Three, conspiracy to distribute drugs and launder money. On the same date Spencer pled guilty to *Count* Two, the drug conspiracy. On April 28, 1999, the day trial was scheduled, Orange pled guilty to a one-count information charging him with maintaining a place for manufacture and distribution of cocaine base, cocaine and marijuana in violation of 21 U.S.C. § 856(a)(1).

Ursala was sentenced on November 8, 1999. Under the United States Sentencing Guidelines (U.S.S.G.), her total offense level was 18, Criminal History Category II, and she faced a sentence range of 30 to 37 months. The Government moved for a sentence reduction based on substantial assistance. Lead investigator Detective William H. Hart (Hart) testified in support of the substantial assistance motion. According to the Memorandum of Sentencing Hearing:[2]

> [Hart] related that [Ursala] voluntarily provided information with regard to her husband, Calvin Dyess' whereabouts, she cooperated from December of 1998 providing significant information with regard to assets, in particular, a motorcycle and $300,000 in cash. He testified she also provided information with regard to Orange Dyess. Detective Hart testified that this was the first time that

---

1. Calvin was also charged in *Count* One, continuing criminal enterprise, 21 U.S.C. § 848; *Count* 4 (with Spencer and Lori Nicole Cummings), aiding and abetting interstate travel to facilitate an unlawful business activity, 18 U.S.C. §§ 1952(a)(3) and 2; *Count* Five, distribution of cocaine base; *Count* Six, unauthorized use of telecommunication services, 18 U.S.C. § 1029(a)(2); *Count* Seven, aiding and abetting marijuana distribution, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; *Count* Eight (with Spencer), aiding and abetting pos-

session with intent to distribute cocaine base, cocaine, and marijuana, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; *Count* Nine, felon in possession of a firearm, 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and *Count* Eleven, distribution of cocaine base, 21 U.S.C. § 841(a)(1).

2. *United States v. Dyess*, 2:99–00012–02, slip op. at 3 (S.D.W.Va. Nov. 8, 1999) (Memorandum of Sentencing Hearing and Statement of Reasons).

he had ever given testimony in support of a downward departure in all his years in law enforcement.

In lieu of incarceration, Ursala was placed on five years' probation with the first six months on home confinement with electronic monitoring.

Bartram was sentenced July 26, 1999. At sentencing he withdrew his objection to relevant conduct calculations of drug amounts in the Presentence Investigation Report (PSR) and, through his counsel, acknowledged responsibility for a drug quantity in excess of 150 grams of cocaine base. No evidence was presented at the hearing. Bartram's only remaining objection was to the PSR's recommendation denying credit for acceptance of responsibility. The Court sustained that objection and granted the credit. Bartram was sentenced within the Guideline range to 132 months incarceration, a three-year term of supervised release, a two thousand dollar ($2,000.00) fine and $100 special assessment.

On August 25 to 26, 1999 a contested sentencing hearing was held for Calvin, Orange and Spencer. The witnesses at that hearing included Ursala, Benjamin Green (indicted separately), Lori Nicole Cummings, and Hart and his partner, George Henderson, the Charleston police detectives who were DEA task force agents on this case. After two days of testimony, on August 26 Calvin was sentenced to life imprisonment and a twenty-five thousand dollar ($25,000.00) fine on *Count* Two and, on *Count* Three, 108

months imprisonment concurrent with the sentence on *Count* Two. Orange was sentenced to 235 months imprisonment, a three-year term of supervised release, and directed to pay jury costs incurred because he pled the day of trial. Spencer was sentenced to 262 months imprisonment, five years supervised release, and a ten thousand dollar ($10,000.00) fine.[3] The sentences imposed were all within the guideline ranges determined at sentencing.

Calvin, Spencer, Orange and Bartram timely noticed appeals, which were later consolidated by the Fourth Circuit for purposes of briefing and oral argument.

## B. Government Disclosures: Ursala's Allegations

Beginning on April 29, 2002 while these cases were still on direct appeal, the United States made a series of disclosures pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972),[4] of materials demonstrating that lead investigator Hart engaged in a personal relationship with Ursala Dyess, which began in early 1999. Ursala subsequently divorced Calvin and she and Hart were married in July 2001.[5] By December 2001 Hart and Ursala were in the process of divorce. On December 10, 2001 Ursala met with an FBI special agent in the presence of a United States Attorney and Ursala's counsel. In the interview, Ursala alleged she and Hart began a personal and sexual

3. All sentences included the appropriate special assessments.

4. The Government disclosure notes many allegations in the disclosures are unsubstantiated and may not be appropriate *Brady/Giglio* material, but full disclosure was made out of an abundance of caution.

5. The Government provided a summary pursuant to the April 29, 2002 disclosure stating Ursala began cooperating with the United States immediately upon arrest in December 1998. However, the Government's November 5, 2002 disclosure reveals Ursala initially volunteered information about Calvin's drug-related activity to West Virginia State Police Corporal B.D. Gore on January 12, 1998.

relationship in approximately February 1999. According to Ursala, Hart encouraged her to lie to the Court, brought her statements of other witnesses to memorize and coached her testimony. When Ursala was given a polygraph in early February 1999 concerning whether she had retained any drug assets,[6] she failed the examination, but Hart withheld the findings from the United States Attorney. Ursala further alleged that when she provided eighty thousand dollars ($80,000.00) in drug assets to Hart and his partner, Detective George Henderson, Hart allowed her to keep for her own use approximately twenty-seven thousand dollars ($27,000.00). On February 4, 1999 Hart turned in forty-one thousand six hundred thirty dollars ($41,630.00) to the United States. According to Ursala's version, eleven thousand three hundred seventy dollars ($11,370.00) of the eighty thousand dollars ($80,000.00) remains unaccounted for.

The disclosures confirm Ursala, at Hart's request, was given a polygraph on February 2, 1999. The test results, which indicated deception, were not disclosed by Hart to the United States Attorney until December 11, 2001. Hart later admitted allowing Ursala and co-defendant Ben Green to keep some amount of money. Hart's partner Henderson confirmed they allowed Ursala to keep money, which he estimated did not exceed three thousand dollars ($3000.00).

Also among the disclosures are FBI interviews with Ursala in which she claimed Hart told her he would make sure Calvin would never get out of jail or hurt her. According to Ursala, Hart also promised her she would not go to jail because he was the lead officer in the case and could do whatever he wanted. After Ursala was sentenced to probation, she alleges Hart later threatened he had obtained probation for her and he could get her taken off probation. The majority of the disclosures containing these allegations were made between April 29 and July 30, 2002.[7]

### C. Action on Remand

On August 28, 2002 the Fourth Circuit Court of Appeals remanded these consolidated cases, directing:

> In view of the filing by the United States on April 29, 2002 of some 126 pages of documents styled "Disclosure by the United States," it is ADJUDGED and ORDERED that this case shall be, and it hereby is, remanded to the district court to conduct such further proceedings as it may deem appropriate.

*United States v. Dyess,* Nos. 99–4566, 99–4665, 99–4666, 99–4667 (4th Cir. Aug. 28, 2002) (Remand Order).

On remand, Defendants Calvin, Spencer and Bartram initially moved to recuse or disqualify the United States Attorney's of-

---

6. Ursala earlier tendered two hundred sixty-two thousand three hundred seventy-five dollars ($262,375.00) of alleged drug assets to the Government. The question was whether she retained additional drug assets.

7. The United States made disclosures on April 29, May 28, May 30, July 17, July 30 and November 5, 2002.

Spencer, seeking remand from the Appeals Court, presented affidavits of co-Defendant Lori Nicole Cummings and Benjamin Green, Jr. and Terryonto McGrier, elsewhere indict-

ed, and a sworn statement by Marlon Rush all averring Hart suborned their perjury with threats and promises. Additionally, an affidavit, similar in appearance to those of Cummings and Green, prepared for co-Defendant Eddie Ray Dyess (Eddie) and making similar allegations, was presented to Eddie's probation officer. Eddie refused to sign the document because he acknowledged it was false. He then gave the unsigned affidavit to his probation officer who provided it to the Court.

fice for the Southern District of West Virginia. The Court noted:

> [t]his case presents questions of ethical conduct and the appearance of impropriety in a disturbing factual scenario, which is unprecedented in this Court's experience. The lead AUSA who prosecuted this case also managed case agents and witnesses who allegedly (and by their own admissions) stole drug proceeds, suborned perjury, lied under oath, and tampered with witnesses.

United States v. Dyess, 231 F.Supp.2d 493, 495 (S.D.W.Va.2002). The Court emphasized:

> that at this time there are no allegations of improprieties or misconduct by the U.S. Attorney's Office, in general, or by [lead prosecutor] Ms. Schwartz, in particular. The Court's action is not predicated on such wrongdoing, or even the possibility of such wrongdoing. Not impropriety, but the potential appearance of impropriety motivates the decision.

Id. at 497. On that basis, the Court disqualified the office of the United States

Attorney for this district. The Department of Justice appointed the office of the United States Attorney for the Eastern District of Virginia to represent the Government in this case.[8]

 After a period necessary for the new prosecutors' review of the extensive record passed, Defendants moved for various forms of relief: 1) an evidentiary hearing for the presentation of evidence raised by the Government disclosures and attendant events; and, alternatively, 2) dismissal of the indictments based on outrageous Government conduct, or 3) permission to withdraw pleas based on the Government's breach of plea agreements and because the pleas were not knowing and voluntary, or 4) vacating the judgments of conviction and sentencing previously imposed and resentencing Defendants with downward departures based on Government misconduct. Defendants also request a "different" probation officer be appointed to conduct a fully independent investigation.[9] Additionally, Bartram moves for a new trial under Federal Rule of Criminal Procedure 33.[10] Briefing is

---

**8.** The United States Attorney's office for the Northern District of West Virginia also was appointed to investigate and prosecute Hart, Henderson and, perhaps, others. At a hearing on May 29, 2003, the undersigned deferred action on a proposed plea agreement under which Hart would plead to a single count information charging violation of 18 U.S.C. § 641, theft of federal money or property, with a stipulation the sum at issue does not exceed one thousand dollars ($1000.00). United States v. Hart, 2:03–00077, slip op. at 1 (S.D.W.Va. May 29, 2003) (Plea Hearing Order Deferring Action). Because the information was extremely limited with regard to the alleged offense conduct, especially considering the allegations then known to the Court and outlined above, the Court deferred ruling on the proposed plea until Hart testifies regarding the Dyess-related allegations and/or these remanded matters are concluded. Id. at 3. Hart's criminal charge remains unresolved.

**9.** At Defendants' original sentencing, each presentence investigation report was prepared by a different probation officer. Presumably, Defendants seek a probation officer not previously involved with any of these Defendants. Probation Officer Ruth Loftis, who has been assigned to these cases on remand, did not prepare any of these Defendants' prior PSRs. The Court **DENIES** the motion as moot.

**10.** "By its express terms, Rule 33 is confined to those situations in which a trial has been had. In the court below, appellant admitted his guilt, abjuring a trial. A defendant who enters a guilty plea cannot thereafter use Rule 33 as a wedge to undo his acknowledgment that he committed the offense." United States v. Graciani, 61 F.3d 70, 78 (1st Cir.1995) (citing United States v. Collins, 898 F.2d 103, 104 (9th Cir.1990)). In an unpublished decision, our Court of Appeals recently cited Collins with approval for the proposition that

complete and the motions are ripe for review.[11]

## II. DISCUSSION

### A. Indictments: Outrageous government misconduct

■ Defendants urge the Court to exercise its supervisory power to dismiss the indictments and bar re-prosecution based on outrageous government misconduct.[12]

■■ Government conduct may violate due process and prevent prosecution of a defendant who is predisposed to commit the crime,[13] if the conduct is truly egregious. *Hampton v. United States*, 425 U.S. 484, 492–93, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (Powell, J., concurring); *United States v. Jones*, 18 F.3d 1145, 1154 (4th Cir.1994). In *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the Supreme Court vacated the conviction of a suspected drug dealer whose stomach had been forcibly pumped to obtain capsules as potentially incriminating evidence he had been seen to swallow. Twenty years later, the Court noted that *Rochin* was rare but not unique. In dictum, the Court noted it might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a convic-

---

*Rule* 33 applies only to cases where a trial occurred. *See United States v. Rice*, 205 F.3d 1336, 2000 WL 234510, *1 (4th Cir.2000). Additionally, a motion for a new trial based on newly discovered evidence must be made within three years of a finding or verdict of guilt. Fed. R. Crim P. 33. This limitation is jurisdictional, *United States v. Robinson*, 361 U.S. 220, 225–26, 80 S.Ct. 282, 4 L.Ed.2d 259 (1960), *United States v. Smith*, 62 F.3d 641, 648 (4th Cir.1995), and a district court may not extend the time to file such a motion, even for good cause, Fed. R. Crim P. 45(b)(2). Bartram pled guilty on April 23, 1999, he was sentenced July 26, 1999, and his motion for a new trial was not filed until July 7, 2003, well past the three-year limit. Bartram's motion for a new trial is DENIED because it is not available to one who pled guilty and, in any case, the motion was unseasonable.

11. Although both are represented by counsel, Defendants Calvin and Spencer moved to reply *pro se* to the Government's response to Defendants' motions. In its discretion, the Court permitted those filings in addition to replies prepared by counsel.

12. In *pro se* reply memoranda prepared by Calvin, he also argues the Court lacks jurisdiction because the indictment failed to state a violation of federal law since it did not include a drug quantity, which is an element of the offense under *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In *United States v. Cot-*

*ton*, 535 U.S. 625, 631, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002), the Supreme Court held an indictment omission or defective indictment does not deprive a court of jurisdiction. *Cotton* dealt specifically with the omission of a drug quantity in relation to *Apprendi*. While such an error renders enhanced sentences erroneous, *see id.*, it does not rise to the level of plain error, *see id.* at 632–33, 122 S.Ct. 1781. To the extent *Ex parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), held otherwise, it was overruled. *See id.*, 535 U.S. at 631, 122 S.Ct. 1781.

Calvin also contends the Superseding Indictment was not returned in open court. Because it was handed down with two other cases, one of them sealed, the return order was not docketed; however, the Court attaches a certified copy of the Magistrate Judge's courtroom record book, showing acceptance of the grand jury returns, including the Superseding Indictment, on February 17, 1999.

13. While conflated in their origins, the doctrines of entrapment and outrageous government conduct are different and distinguishable. The due process argument is distinct from the traditional entrapment defense because it does not focus on the predisposition of the defendant. *United States v. Russell*, 411 U.S. 423, 434, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). Rather this doctrine focuses on the means employed in a police investigation.

tion." *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (citing *Rochin* ). Such outrageous government misconduct, however, must violate that " 'fundamental fairness, shocking to the universal sense of justice' mandated by the Due Process Clause of the Fifth Amendment." *Id.* at 432, 93 S.Ct. 1637. In *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), the Court potentially narrowed the doctrine further when it explained that even if an unlawful search was "so outrageous as to offend fundamental 'canons of decency and fairness,' . . . the fact remains that '[t]he limitations of the Due Process Clause . . . come into play only when the Government activity in question violates some protected right of the defendant.' " *Id.* at 737 n. 9, 100 S.Ct. 2439 (quoting *Hampton,* 425 U.S. at 490, 96 S.Ct. 1646) (plurality opinion) (internal citations omitted).

■ The Fourth Circuit accepts the continued viability of the outrageous government conduct doctrine, but makes clear that a due process violation occurs only where official conduct is not simply offensive, but is truly outrageous. *United States v. Goodwin,* 854 F.2d 33, 37 (4th Cir.1988). As the Appeals Court noted, the appellate courts have "over time continued to demonstrate a high shock threshold in the presence of extremely unsavory government conduct." *United States v. Osborne,* 935 F.2d 32, 36 (4th Cir.1991); *see also Indictments,* 91 Geo. L.J. 236, 239 n. 843 (2003) (collecting cases acknowledging the outrageous government misconduct doctrine, none of which find such misconduct). The First Circuit has declared the outrageous government misconduct doctrine "moribund" in light of the fact that, in practice, "courts have rejected its application with almost monotonous regularity." *United States v. Santana,* 6 F.3d 1, 4 (1st Cir.1993) ("The banner of outrageous conduct is often raised but seldom saluted."). To reach this high standard of outrageousness is no easy matter:

> Although the requirement of outrageousness has been stated in several different ways by various courts, the thrust of each of these formulations is that the challenged conduct must be shocking, outrageous, and clearly intolerable. . . . The cases make it clear that this is an extraordinary defense reserved for only the most egregious circumstances. It is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating. Nor is it intended merely as a device to circumvent the predisposition test in the entrapment defense.

*United States v. Mosley,* 965 F.2d 906, 910 (10th Cir.1992) (collecting and reviewing cases).

■ Sexual misconduct by government agents is apparently sufficiently commonplace that the Second Circuit had occasion, upon review of such cases, to develop a test for when an evidentiary hearing is warranted for such claims. *United States v. Cuervelo,* 949 F.2d 559 (2d Cir. 1991). In that case, the DEA agent conducting a drug conspiracy investigation tried to establish a "love interest" between himself and the defendant, had sexual relations with her on at least fifteen occasions, bought her gifts and wrote her love letters. The district court denied the motion to dismiss the indictment without holding an evidentiary hearing. The appeals court held an evidentiary hearing must be conducted if the defendant raises allegations meeting these criteria:

> (1) That the government consciously set out to use sex as a weapon in its investigatory arsenal, or acquiesced in such conduct for its own purposes upon learning that such a relationship existed;

(2) That the government agent initiated a sexual relationship, or allowed it to continue to exist, to achieve governmental ends; and

(3) That the sexual relationship took place during or close to the period covered by the indictment and was entwined with the events charged therein.

*Id.* 949 F.2d at 567; *see also United States v. Nolan–Cooper,* 155 F.3d 221, 233 (3d Cir.1998) (employing similar test at merits stage, except applying factor (1) if the government *knew or should have known* ). The Court agrees the *Nolan–Cooper* test provides a useful framework within which to examine a claim of outrageous government conduct involving sexual misconduct by government agents, with the proviso that the ultimate question remains whether the Government's acts were so "shocking, outrageous, and clearly intolerable" that Due Process was offended.

 Considering the situation of these Dyess Defendants, the test clarifies the problems that underlie the instant outrageous misconduct claim. Accepting only for the sake of argument the truth of all the allegations currently made against Hart in relation to these cases, there is no allegation he undertook the sexual relationship with Ursala for Government purposes or for investigatory purposes. Instead, he sought to satisfy personal needs, personal desires and personal ends by his sexual and, ultimately, short-term marital relationship with Ursala. To the extent it is alleged Hart sought to suborn perjury to increase drug amounts attributed to Calvin, with consequent potential effect on Spencer and Orange's sentences, the purpose was to illustrate Hart's power to Ursala and "protect" her from Calvin. Again, these were personal, not governmental goals. While the relationship, according to Ursala, began as early as February 1999, close to the time the superseding indictment was handed down, there is no allegation the Government in any guise other than through its agents Hart and Henderson knew or should have known of the relation until, at the earliest, December 2001 when Ursala came forward to make allegations about Hart.[14] Even the Ursala/Hart marriage, which was publicly announced, took place in July 2001, almost two years post-sentencing, by which time the relevant investigations were long past and closed. Considered under this test, Hart's sexual relationship with a co-defendant is not Government misconduct of a sufficiently shocking and intolerable type to warrant an evidentiary hearing on this issue, much less to raise the issue if the indictments should be dismissed. Defendants' motion to dismiss the indictment with prejudice on that basis is **DENIED.**

 The Court next considers Hart's alleged subornation of perjury at the sentencing phase as a potential due process violation. Even when government conduct outside the indictment process interferes with a constitutionally protected right, the Supreme Court has held that a defendant must show actual prejudice to warrant dismissal of an indictment with prejudice. *See United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1983); *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *see also United States v. Derrick,* 163 F.3d 799, 806–07 (4th Cir.1998) (reviewing Su-

14. In the Court's file is a letter from Calvin to the Court stating that "Billy Hart ... engaged in numerous mis-conduct for benefitting to taint evidence against me and others in this case" [sic]. Although the letter is undated, the return address is FCI Beaumont, indicating it was written some time after sentencing. A copy of the letter is attached to this Memorandum Opinion to make it available to all parties.

preme Court and Fourth Circuit precedent on this point). And even when the defendant can show prejudice, the Court suggested that dismissal may be too drastic when the prejudice can be remedied by a new trial or suppression of tainted evidence, *id.* at 365 & n. 2, 101 S.Ct. 665, a point taken by our Court of Appeals in *Derrick*, which held that an indictment need not be dismissed for prosecutorial misconduct where a new trial eliminated any potential prejudice to defendant.[15] *Derrick*, 163 F.3d at 809. In this case, as discussed *infra*, an evidentiary hearing on alleged perjured testimony offered at sentencing and resentencing, if necessary, cleansed of the tainted evidence, should cure any prejudice engendered by Hart's malfeasance, if ultimately proven. Defendants' motion to dismiss the indictments on this basis is **DENIED**.

## B. Withdrawal of Pleas

None of these Defendants claims, or has ever claimed, actual innocence of these charges. Each of them pled guilty pursuant to a plea agreement. Now they seek to withdraw their guilty pleas.

■ A voluntary, knowing, and intelligent guilty plea waives all nonjurisdictional defects including a right to challenge factual guilt of the charges. *United States v. Willis*, 992 F.2d 489, 490–91 (4th Cir. 1993). In *Tollett v. Henderson*, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973), the Court recognized and adopted a rule applicable to these cases:

We thus reaffirm the principle recognized in the *Brady* trilogy: a guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.

411 U.S. at 267, 93 S.Ct. 1602.

In *United States v. Bowman*, 348 F.3d 408 (4th Cir.2003), our Court of Appeals recently reviewed the conditions under which a plea may be withdrawn:

Federal Rule of Criminal Procedure 11 authorizes the withdrawal of a guilty plea *before sentencing* if "the defendant can show a fair and just reason for requesting the withdrawal." Fed. R.Crim.P. 11(d)(2)(B). A defendant has no "absolute right" to withdraw a guilty plea, and the district court has discretion to decide whether a "fair and just reason" exists upon which to grant a withdrawal. The most important consideration in resolving a motion to withdraw a guilty plea is an evaluation of the Rule 11 colloquy at which the guilty plea was accepted. Thus, when a district court considers the plea withdrawal motion, " 'the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary' .... A voluntary and intelligent plea of guilty 'is an admission of all the elements of a formal criminal charge,' ... and constitutes an admission of all 'material facts alleged in the charge.' " Accordingly, a properly conducted Rule 11 guilty plea colloquy

---

**15.** The *Morrison* court noted an exception to the general prejudice requirement where dismissal of an indictment may be warranted to deter a pattern of recurring violations by investigative officers. 449 U.S. at 365–66 n. 2, 101 S.Ct. 665. That is not the situation here and, as our Court of Appeals explains, dismissal is, in any case, an ultimate and extraordinary remedy. *Derrick*, 163 F.3d at 810. Courts should seek a lesser remedy where available and, in this case, vigorous prosecution of the errant officer should suffice.

leaves a defendant with a very limited basis upon which to have his plea withdrawn.

*Id.*, 348 F.3d at 413–14 (emphasis added).

■ The Government proposes that the rules allow plea withdrawal only before sentencing, citing former *Rule* 32(e), now *Rule* 11(e):

> If a motion to withdraw a plea of guilty or nolo contendere is made before sentence is imposed, the court may permit the plea to be withdrawn if the defendant shows any fair and just reason. At any later time, a plea may be set aside only on direct appeal or by motion under 28 U.S.C. § 2255.

Fed.R.Crim.P. 32(e)(1999). The procedural posture of these cases, however, undermines this argument. While sentence was imposed in all four cases in 1999, it now appears under the Appeals Court's broad remand order that to remedy potential prejudice stemming from the Government's disclosures may require resentencing, as discussed throughout this opinion. By the unfortunate actions of Government agents, Defendants potentially are returned to the situation before sentencing, so the Court must consider whether any

has given a fair and just reason to withdraw his plea.

■ The first consideration is the *Rule* 11 plea hearing. The undersigned conducts a closely scripted plea hearing in every instance that closely follows the *Rule* 11 requirements. Fed.R.Crim.P. 11(b), (c). After the Court determines the competency of the defendant to proceed, the Government summarizes the plea agreement and the Court ascertains that Defendant has reviewed and understands the agreement and whether there exist any other agreements between the parties, particularly with regard to relevant conduct. The Court then reads the charging instrument,[16] sets forth the elements the Government would be required to prove beyond a reasonable doubt to convict and provides explanation and definitions of those elements as required. The Defendant is then asked to explain, in his own words, what he did in violation of law, to determine if there is a factual basis for the plea.[17] Next the Defendant is informed of the trial rights he gives up in pleading guilty, the Government's right to use any statement Defendant makes under oath against him in a prosecution for perjury, the maximum statutory penalties Defendant faces, the effect of the sentencing

---

**16.** Where a defendant pleads to an information, as both Orange and Bartram did, the Court also assures itself that the defendant knowingly and voluntarily waives the right to proceed by indictment.

Calvin argues *pro se* that his plea was not knowing because no drug quantity was stated in the indictment. In light of *United States v. Cotton, supra,* holding that an indictment that omits a drug quantity is sufficient to sustain a conviction, the failure of the Court to inform Defendant of a drug quantity at the plea hearing is no reason to allow withdrawal of the plea, particularly here. If Defendant is resentenced it will be done acknowledging *Apprendi* and its progeny. *See infra* at II.E.

**17.** Calvin, for example, pled guilty to *Counts* Two and Three of the Superseding Indict-

ment. In pleading guilty to *Count* Two, drug conspiracy, he said, "We all—we just got together and decided to sell drugs and, you know, and started selling them and buying them." He named as co-conspirators "Lance and—Lance Todd Williams and Benjamin Green and Eric Spencer and myself, a couple other people under the conspiracy." In pleading to *Count* Three, money laundering, Calvin said, "I took—I took the money from the—the money I was making from the drugs and bought a house and a car and other things." His purpose, he said, was "[t]o try and open up a business and, you know, to legitimize the money from the drug money." He admitted laundering drug proceeds in excess of fifty thousand dollars ($50,000.00).

guidelines, and that the plea agreement prevents withdrawal of a plea and any claim of a right to a trial. The Court assures itself the Defendant understands each of these conditions. Each of these Defendants were so informed and then answered the following series of questions:

> Q. Knowing all these things are you prepared to go forward with a written plea of guilty today?
>
> . . .
>
> Q. Has any person or any agency in any way threatened you or coerced you or intimidated you into entering a plea against your will?
>
> . . .
>
> Q. Has anyone made any promises or predictions to you as to how this judge will sentence you different than what I have discussed with you?
>
> . . .
>
> Q. Are you, in fact, acting voluntarily and of your own free will in reaching this decision?

These Defendants all agreed their decisions to plead guilty were voluntary. After a series of questions to counsel and to Defendants concerning the adequacy of representation, Defendants were informed: "If you do not have any doubts or second thoughts about this matter, I have a written plea of guilty form for you to sign, to be witnessed by your counsel." Each Defendant signed the written plea of guilty form.

■■■ Defendants now claim their plea was not knowing and voluntary because they did not have the advantage of knowing the matters later disclosed by the Government before they entered their pleas. They argue the *Brady* and *Giglio* violations,[18] the Government's failure to disclose evidence that was at a minimum impeachment evidence and possibly also exculpatory, undermines confidence in the pleas.[19] The pleas could not have been knowledgeable because this information was withheld, Defendants contend, and the withholding of information amounts to coercion and intimidation, making the pleas involuntary.

The Supreme Court foreclosed this argument in *United States v. Ruiz*, 536 U.S. 622, 633, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002). *Ruiz* holds "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." The Court acknowledges "the more information the defendant has, the more aware he is of the likely consequence of a plea, waiver, or decision, and the wiser that decision will likely be. But the Constitution does not require the prosecutor to share all useful information with the defendant." *Id.* Because the Government had no duty to disclose this impeachment information, the failure to provide it does not undermine either the knowing or voluntary quality of these pleas.

■■■■■ Our Court of Appeals has provided a nonexclusive list of factors for

---

**18.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

**19.** While Defendants make this argument, they make no showing and provide no basis to believe that the disclosures now available are exculpatory, and no Defendant makes a claim of innocence. *See Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (exculpatory evidence is evidence the suppression of which would "undermine confidence in the verdict"). Instead, the disclosures provide potential impeachment of the implicated witnesses and call into question their testimony about attributable drug amounts and possibly other sentencing factors.

consideration in deciding a withdrawal motion:

> (1) whether the defendant has offered credible evidence that his plea was not knowing or not voluntary, (2) whether the defendant has credibly asserted his legal innocence, (3) whether there has been a delay between the entering of the plea and the filing of the motion, (4) whether defendant has had close assistance of competent counsel, (5) whether withdrawal will cause prejudice to the government, and (6) whether it will inconvenience the court and waste judicial resources.

*United States v. Moore,* 931 F.2d 245, 248 (4th Cir.1991). The first two factors are crucial, the first because:

> If an appropriately conducted Rule 11 proceeding is to serve a meaningful function, on which the criminal justice system can rely, it must be recognized to raise a strong presumption that the plea is final and binding.

*United States v. Lambey,* 974 F.2d 1389, 1394 (4th Cir.1992) (en banc). Defendants have provided no credible evidence their pleas were not knowing and voluntary, nor have any of them asserted their legal innocence.[20]

The delay in moving to withdraw their pleas is not attributable to these Defendants because their basis is the Government disclosures that began April 29, 2002, almost exactly three years after their respective pleas of guilty.

In his *pro se* motions Calvin complains of his counsel's insufficient advice regarding federal jurisdiction under *Apprendi* and the ostensible failure to return the indictments in open court, both of which are merely Calvin's meritless arguments and do not demonstrate any failure by counsel. Calvin also argues his counsel failed to move to withdraw his guilty plea; however, he presents as an exhibit a Motion to Withdraw Guilty Plea prepared by his counsel and certified as hand-delivered to the Government and probation officer the day before sentencing. Apparently, however, the motion was never filed and the issue was never raised at the two-day sentencing hearing. This apparent strategic decision is not *prima facie* evidence of any failure by counsel. In contrast, Calvin agreed at his plea hearing in response to a series of questions that he had an adequate amount of time to fully discuss his case with counsel, counsel had been able to answer his questions about the best way to proceed in the case, and he was satisfied with the quality of his legal services to that point in time, knowing counsel was representing him in a serious criminal matter. Nothing Defendant has brought forward to date demonstrates those answers were mistaken or misinformed.

Finally, withdrawal of the plea "almost invariably prejudices the government to some extent and wastes judicial resources." *United States v. Sparks,* 67 F.3d 1145, 1154 n. 5 (4th Cir.1995). For that reason, those factors can weigh in a defendant's favor "so long as [he] shows the magnitudes of the prejudice and inconvenience are small; the defendant need not show that the effects are nonexistent." *Id.* Here, however, the prejudice would be extreme, requiring the Government to mount a criminal trial five years after the indictment was handed down, with the attendant loss of access to witnesses and

---

**20.** Orange argues he pled guilty because false testimony at his suppression hearing convinced him he had no other choice and a "plea agreement was his only reasonable alternative." This calculation, or miscalculation, by Defendant, however, does not under-

mine a determination his plea was knowing, voluntary, and intelligent based on the *Rule* 11 hearing in which he told the Court, under oath, he voluntarily chose to plead guilty and acknowledged his guilt.

evidence, fading memories, and the unavailability of sentence-reduction awards to cooperating witnesses because of the passage of time.

Considering that the crucial first and second *Moore* factors do not support the Defendants' motion, the third factor is neutral, the fourth provides no support for Defendants, and the fifth and sixth factors favor the Government, the Court **CONCLUDES** Defendants will not be permitted to withdraw their pleas.

### C. Breach of Plea Agreements

Defendants next contend the Government breached its implied obligation of good faith and fair dealing underlying the plea agreement by its failure to disclose the Hart misconduct. Calvin also argues the Government breached his plea agreement by failure to debrief him.

■■■■ Each of these Defendants pled pursuant to a plea agreement with the Government. "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). As Defendants explain:

> Plea bargains rest on contractual principles, and each party should receive the benefit of its bargain. Yet, the analysis of the plea agreement must be conducted at a more stringent level than in a commercial contract because the rights involved are generally fundamental and constitutionally based.

*United States v. Ringling*, 988 F.2d 504, 506 (4th Cir.) (citing *United States v. Harvey*, 791 F.2d 294, 299 (4th Cir.1986)). With the exception of Calvin's claim, Defendants point to no particular clause or promise of the agreement that was breached, but more generally argue the Government breached its implied obligation of good faith and fair dealing. "[A]s in all contracts, plea agreements are accompanied by 'an implied obligation of good faith and fair dealing.'" *United States v. Ahn*, 231 F.3d 26, 35–36 (D.C.Cir.2000) (quoting *United States v. Jones*, 58 F.3d 688, 692 (D.C.Cir.1995)). Therefore, where a plea agreement leaves discretion to the prosecutor, the district court may entertain claims that the prosecutor failed to act in good faith in exercising that discretion. *See United States v. Vargas*, 925 F.2d 1260, 1266 (10th Cir.1991).

■■■■ The Government's obligation does not extend, however, to actions that the plea agreement does not obligate the Government to perform and which it has no independent duty to perform, for example, disclosure of impeachment information prior to a plea agreement. Additionally, the Government could not have breached the plea agreement *prior to* entering the agreement. Under *Giglio*, when the reliability of a witness may determine guilt, the failure to disclose information that affects credibility is a denial of due process. 405 U.S. at 154–55, 92 S.Ct. 763. However, after Defendants pled, their guilt was no longer an issue implicating a *Giglio* obligation.

■■ The plea agreements in this case include a clause under which the United States "reserves the right to ... [a]dvise the Court concerning the nature and extent of [Defendant's] cooperation." In *United States v. Ringling*, 988 F.2d 504, 506 (4th Cir.1993), the court found a statement in a plea agreement that the Government "will make known at the time of sentencing the full nature and extent of Defendant' cooperation ..." implicitly required the Government to debrief Ringling prior to sentencing so that it could fulfill this promise. *Id.; see also United States v. Beltran–Ortiz*, 91 F.3d 665, 667 (4th Cir.1996) (plea agreement to recommend sentence at low end of guidelines "if the

defendant, upon debriefing by government agents, is completely forthright and truthful"). The language in these agreements is less explicitly promissory than either *Ringling* or *Beltran–Ortiz.* Nevertheless, it implies some opportunity should be made available to Defendant to cooperate through debriefing.

According to Calvin's Proffer and his counsel's argument at sentencing, Calvin was debriefed only once and that was before he entered a plea agreement. In response the Government contended that Calvin failed to cooperate initially and so it was not interested in further debriefing.[21] For whatever reason, it appears Calvin was not debriefed after entering his plea agreement. If Calvin's case is set for re-

sentencing, specific performance of this implicit promise will be available to him. Prior to any resentencing, the Government is **DIRECTED** to debrief Calvin and, at sentencing, advise the Court of the nature and extent of his cooperation.

## D. *Evidentiary Hearing and Re–Sentencing*

■ The Government's disclosures do not affect or undermine confidence in these Defendants' pleas, which must stand. The Court next must determine if the allegedly manufactured and perjured testimony tainted the sentences imposed at the consolidated sentencing hearing for Calvin, Spencer, and Orange. If so, it will be necessary to resentence those three Defendants.[22]

---

**21.** Calvin responded to that failure with the Proffer, undated but which he claims was provided to the Government before sentencing, which avers no Government agent would agree to debrief him. Additionally, he offered the identity of four cocaine dealers in New York City and five cocaine dealers in Houston, Texas with all of whom he had dealt or had substantial contact. Calvin further averred his best estimate of the amount of drugs he had introduced to Charleston, West Virginia was 12 to 17 kilograms of powdered cocaine, 100 pounds of marijuana, and 18 to 20 ounces of "crack" cocaine. (Defs. Calvin and Spencer's Reply, Ex. 1.)

**22.** Michael Bartram's case and his situation are distinguishable and separable from those of the other three Defendants remanded. Bartram was arrested by officers of the Huntington Police Department on June 18, 1998. Officers Hart and Henderson were then employed by the Charleston Police Department and had no part in the arrest. Bartram admitted he sold the 1.8 grams of crack cocaine to Junior Brown, the passenger in Bartram's vehicle when he was pulled over and arrested. Bartram's connection with the Dyess conspiracy was through drug dealing with Dyess co-Defendant Simernon Rogers, who is not otherwise involved or implicated in the allegations of police misconduct, perjured testimony or withholding drug proceeds.

Bartram pled guilty to a one-count information charging him with distribution of crack cocaine. His sentencing was uncontested. Bartram admitted all relevant conduct and received a three-point reduction for acceptance of responsibility.

Now Bartram argues he pled guilty because he was facing fabricated allegations of involvement with a major drug conspiracy and chose to avoid attribution of the total amounts of drugs in the conspiracy. However, Bartram pled to an information unrelated to the conspiracy. At his plea hearing, Bartram acknowledged the 1.8 grams of crack cocaine that were the offense conduct. The additional drug weight on which his sentence was based all was calculated from a statement by his girlfriend, later his wife, Fiasili Fitisemanu, that she had seen Bartram and Simernon Rogers counting anywhere between $30,000 to $40,000 in cash. The smaller amount was converted to 150 grams of crack cocaine based on $200/gram.

Bartram argues that, based on Hart's misconduct, there should be a presumption Fitisemanu made a false statement. That argument is a total *non sequitur.* There is no suggested connection, actual or logical, among Hart, Ursala or other alleged or admitted perjurers and either Bartram or Fitisemanu.

Bartram also contends his wife has recanted her prior statements. In a notarized, unsworn, handwritten statement, Fiasili Bartram says she was high on LSD when she

The Government argues that only Calvin need be resentenced. Orange need not be resentenced because he pled to an information charging him with maintaining a place for the use and distribution of illegal drugs and he never challenged the drug quantity on which his sentence was based.

Nonetheless, among the witnesses relied on in the PSR to establish the drug quantity that provides the base offense level under U.S.S.G. § 2D1.8 and § 2D1.1 are Benjamin Green, Calvin and Ursala Dyess, all of whose testimony has been called into question. In his objections to the PSR filed with the probation officer and summarized for the Court, Orange attacked their testimony, as well as that of Eddie Dyess and Kelly Cole. After considering Orange's objections and their apparent baselessness at the time, the PSR did not recommend credit for acceptance of responsibility because of the consistency of the others' testimony. At sentencing, the Court acknowledged these objections, but held the Government had carried its burden on them and they were overruled. Additionally, Ursala explicitly acknowledged there was some change in how she testified about Orange, but she had been instructed by Hart to maintain consistency in her testimony. She stated she studied notes from other witnesses provided by Hart before testifying about both Calvin and Orange. She also claimed she lied in testimony about drugs at Spencer's apartment, particularly about cooking crack there.

In his PSR Spencer's base offense level was established based on debriefings of various participants including, of course, those whose testimony might be perjured or whose recantations similarly may be tainted. Some of those same participants' testimony supported the three-point enhancement for leadership role that was imposed. In the current circumstances the Court cannot, as the Government proposes, separate out credible testimony from that colored by Hart's activities, Ursala's compliance, and others' later recantations. An evidentiary hearing is necessary to determine which testimony should be credited, what witnesses perjured themselves and if so, when, whether perjury was done in the courtroom or in their after-thought sworn statements.

■ The Government also contends that Officer Hart's misconduct with Ursala had nothing to do with Orange or Spencer: Hart's motive was to put Calvin away for life at any cost and was directed only at Calvin. But as explained above, the testimony Hart directed from Ursala and possibly others affected Orange directly and Spencer either directly or indirectly. This Court does not sit as an appeals court, to consider only matters objected to below. The cases are here on a broad-based remand for "such further proceedings as it may deem appropriate" in view of the Government's disclosures. The sentencing court must assure itself that the sentences imposed were based on truthful testimony and accurate accounts, and that can be

---

testified before the grand jury. She claims "Mike's lawyer and Monica Shwartz [sic]" threatened to take her unborn child away if she came forward with that information. She further states she has never spoken to any of the agents on this case.

While the remand order for these Defendants is broad, it is not unlimited. It remands the cases based on the Government's disclosures, which involve the alleged wrong-

doing of Hart and Henderson, and Ursala's perjured testimony. Unrelated, allegedly perjured testimony proffered by Bartram's wife, tenuously connected to those disclosures only because Bartram was a co-Defendant, is not within the purview of the Appeals Court remand order. Bartram's motions for an evidentiary hearing based on his wife's ostensible perjury and for resentencing on that basis are **DENIED**.

done only by determining the truth of all contested matters in an evidentiary hearing, and then adopting or modifying the sentences accordingly. *Contra* the Government's contentions, to do otherwise could shake the public's confidence that the sentences imposed were lawful, fair, just and principled. When the Government's lead investigative officer has an affair with the chief Defendant's wife during the time of preparation of the PSRs and the consolidated sentencing hearing, later marries her, later still is accused of keeping substantial sums of drug assets and suborning perjury from her and others, public confidence in the criminal justice process is implicated. The Court can assure confidence in the application of criminal justice only through a thorough evidentiary reexamination and resentencing, if necessary.

Defendants raise several issues germane to resentencing. They argue they should receive a downward departure based on Government misconduct. Any arguments for departures, upward or downward, as well as other issues of guideline application, may be considered as appropriate at any resentencing.

 Defendants also contend they should be resentenced under *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).[23] Because the superseding indictment did not state a drug quantity, Calvin and Spencer argue their sentences for *Count* Two, the drug conspiracy, should be limited by the twenty-year statutory cap of 21 U.S.C. § 841(b)(1)(C).[24] *Apprendi* holds that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. Under *Apprendi*, drug quantities must be treated as elements of aggravated drug trafficking offenses under 21 U.S.C. § 841, i.e., charged in the indictment and proved to a jury beyond a reasonable doubt. *United States v. Promise*, 255 F.3d 150 (4th Cir. 2001). Because the superseding indictment in these cases did not state a drug quantity, at any resentencing this Court is limited to the twenty-year statutory maximum of § 841(b)(1)(C) for sentencing on the *Count* Two drug conspiracy charges to which both Calvin and Spencer pled guilty.

### III. CONCLUSION

Bartram's motions for a new trial and for an evidentiary hearing are **DENIED**. The remaining Defendants' motions 1) to dismiss the indictments and bar re-prosecution or 2) to permit withdrawal of guilty pleas are **DENIED**. Calvin Dyess's motion to require debriefing before resentencing pursuant to his plea agreement is **GRANTED**. The Court **GRANTS** Defendants' motion for an evidentiary hearing to

**23.** Defendants also contend their sentences should be vacated pursuant to *Apprendi*, although they provide no authority for the proposition. At the time of remand, *Rule* 35(a) made provision for cases remanded because the original sentence was determined on appeal to have been imposed in violation of law or the guidelines, or to be unreasonable. In such cases a court may conduct "further sentencing proceedings if, after such proceedings, the court determines that the original sentence was incorrect." Fed.R.Crim.P. 35(a)(2)(2002). Here, however, the Appeals Court made no determination about the valid-

ity of these sentences. While these sentences may be vacated within the terms of the remand order in proceedings appropriate "in light of the Government's disclosure," the effects of *Apprendi* do not fall in that category as a reason or basis for vacating them.

**24.** Orange's sentence was limited by the twenty-year statutory maximum under 21 U.S.C. § 856. The sentence imposed approached, but did not exceed the statutory maximum. The rule of *Apprendi* is not implicated.

determine whether the alleged misconduct by Hart, Henderson and Ursala or the purported recantations by Benjamin Green and Lori Nicole Cummings undermine the factual basis for sentencing guidelines calculations in the cases of Calvin, Spencer, and Orange. The evidentiary hearing is **SCHEDULED** for **Tuesday, March 9, 2004 at 10:00 a.m.** The Court defers decision on Defendants' motion for resentencing until after the evidentiary hearing.

The Clerk is directed to inform counsel of record by telephone, email or facsimile transmission that this Memorandum Opinion and Order is published on the Court's website at *http://www.wvsd.uscourts.gov* and to send counsel of record a copy of the Memorandum Opinion and Order by first-class mail.